[Civil No. 2653.   Filed June 22, 1927.]

[257 Pac. 648.]

GEORGE W. P. HUNT, Governor of the State of Arizona, J. C. CALLAGHAN, State Treasurer of the State of Arizona, C. M. ZANDER, Secretary and Purchasing Agent of the Board of Directors of the State of Arizona, as Members of and Constituting the Board of Directors of State Institutions of the State of Arizona, and W. C. LEFEBVRE, State Engineer, of the State of Arizona, Plaintiffs, v. J. C. CALLAGHAN, Treasurer of the State of Arizona, Defendant.

Mr. John W. Murphy, Attorney General, and Mr. A. R. Lynch, Mr. Earl Anderson, and Mr. Frank J. Duffy, Assistant Attorneys General, for Plaintiffs.

Messrs. Mathews & Bilby, for Defendant.

LOCKWOOD, J.—This is an original proceeding in this court against J. C. Callaghan as treasurer of the state of Arizona, hereinafter called defendant, by George W. P. Hunt, J. C. Callaghan, and C. M. Zander, as the board of directors of state institutions of the state of Arizona, and W. C. LeFebvre, state engineer, hereinafter called plaintiffs, to compel defendant to credit to what are known as the "25 per cent apportionment account" and the "75 per cent apportionment account" within the general fund of the state of Arizona certain moneys realized from the gasoline tax imposed by chapter 76, Session Laws of 1923.

Technically speaking, we might limit our decision to the formal question raised by the pleadings, which is as to the crediting of certain moneys paid the treasurer. The matter, however, was treated both by plaintiffs and defendant on the oral argument as an attempt to determine, not merely the crediting of the money, but the status of the taxes imposed by chapter 76, *supra,* which raised such funds, and it was agreed that the ultimate determination of the matter would require our decision on two questions: First, are the various taxes imposed by chapter 76, *supra,* still in force, or have they ceased by operation of law; and, second, if they are still in force, are they now available in any part for the use of the state highway department without further legislation? In view of the vital importance to the state of a prompt settlement of the whole matter, while it may be we could dispose of the case on technical

grounds, we have determined to consider it rather on the merits of the two questions last stated.

In order to arrive at a correct understanding of the situation, it is necessary that we discuss the history of highway legislation in Arizona since statehood, so far as funds raised by state, as distinct from county, taxation are concerned. We will consider first the property tax. It appears that, when the first state legislature met, there was a sharp difference of opinion as to the fundamental principle which should apply to the construction of roads and highways in the new state. One part of the legislature believed that the entire control of funds raised by state-wide taxation for road purposes should be placed in the hands of the state authorities, to be expended by them in such manner as they should think proper. The other portion claimed this would mean the counties which paid the bulk of the taxes and maintained their roads to a great extent out of county funds would be compelled to build highways for the benefit of the less wealthy counties, and insisted the money should be spent where it was raised. After considerable argument, a compromise was reached, which appeared in our statutes originally as chapter 66, Session Laws of 1912, and which was carried into the 1913 Code almost verbatim. The part of this chapter necessary for us to consider is paragraph 5123, Revised Statutes of Arizona of 1913, Civil Code, which reads, so far as material, as follows:

"5123. There shall be annually levied and collected in the manner in which other state taxes are levied and collected, by a levy by the officials provided by law, a sufficient tax to raise the sum of two hundred and fifty thousand dollars annually, said levy to be made upon the taxable property within the state, for the purpose of raising a fund to be known as the state road tax fund, to be expended for the construction, reconstruction, repairing, improv-

ing and maintaining public highways, roads and bridges as follows:

"Twenty-five per cent. of the 'state road tax fund,' herein provided for, shall be subject to be paid out upon the authority and under the direction of the state board of control and state engineer, who are hereby charged with such responsibility. . . .

"Seventy-five per cent. of such state road tax fund herein provided for, shall be apportioned to the several counties in the amount to each county of seventy-five per cent. of the taxes collected under this act, by said county, and such amount shall be subject to be paid out for the construction, reconstruction, repair, improvement and maintenance of public highways, roads, and bridges in the manner as in this act provided, for the work in this act provided for within such county, upon the authority and under the direction of the county board of supervisors of such county and the state engineer, who are hereby charged with such responsibility. . . . "

It will be seen upon examination of this section that it contains three things: A tax levied; an apportionment of the proceeds thereof; and an appropriation. It may be well to define these three terms, for a confusion in regard to their meaning is apparently the cause of many of the errors into which those concerned with the question have fallen. A tax is "the enforced . . . contribution of persons and property, levied by authority of the state for the support of the government and for all public needs." Vol. 8, Words and Phrases, p. 6868. An apportionment is "the act of dividing and assigning in just proportion." Webster's New International Dictionary (1925 ed.). While an appropriation is "the setting aside from the public revenue of a certain sum of money for a specified object, in such manner that the executive officers of the government are authorized to use that money, and no more, for that object, and no other." *State* v. *Moore*, 50 Neb. 88,

61 Am. St. Rep. 538, 69 N. W. 373; *Clayton* v. *Berry,* 27 Ark. 129; *Stratton* v. *Green,* 45 Cal. 149.

It will therefore be seen that the difference between an "apportionment" and an "appropriation" is that, to make the "appropriation," there must be added to the dividing and assigning of funds which constitutes the "apportionment" the specific authority to spend. This difference is of vital importance in the consideration of this case.

The state road tax, then, was at first a continuing one, and was divided into two portions, twenty-five per cent being subject to the sole control of the state authorities and seventy-five per cent to be expended in accordance with the amount paid by each particular county, within its own boundaries, under the joint control of the supervisors and the state engineer.

In 1917 (Laws 1917, chap. 69), paragraph 5123, *supra,* was amended by fixing the tax at ten cents on the hundred dollars valuation of property, and by striking out certain portions of the original paragraph, the purposes of which were merely temporary. In 1921 it was repealed *in toto,* but chapter 157, Session Laws of that year, in section 2 contained provisions almost identical in their nature with the repealed paragraph, except that the tax rate was made five cents instead of ten. Each legislature to 1922, then, which dealt with the subject, made a specific and continuing tax, apportionment and appropriation of a definite amount, which continued in force without further legislation until it was repealed by the act of a subsequent legislature, and the tax, the apportionment and the appropriation were all contained in the same act.

It will also be seen that for ten years the legislature had provided for a division of highway funds of various kinds on the basis of twenty-five per cent to be expended under the authority of the state alone

and seventy-five per cent requiring the joint action of the counties and the state authorities. So firmly had this custom become imbedded in our statutes that it was considered sufficient in other legislation aside from paragraph 5123, *supra,* to refer merely to the "25 per cent. apportionment account" and the "75 per cent. apportionment account" without any description thereof to such an extent that we may take it whenever such phrases were used by the legislature, they referred to certain highway funds which were handled respectively by the state authorities alone or by the county and state authorities jointly.

In 1922 the legislature passed chapter 35 of the Session Laws of that year, commonly known as the Financial Code. Section 126 thereof reads as follows:

"Section 126. That chapter VII of title 50, Revised Statutes of Arizona, 1913, Civil Code, be and the same is hereby amended by inserting therein a paragraph to be known as paragraph 5123 and in lieu of paragraph 5123 as construed by Senate joint resolution No. 1, Session Laws of Arizona, 1915, Second Special Session, and as repealed and amended by chapter 157, Session Laws of Arizona, 1921, Regular Session as follows:

"5123. For the construction, reconstruction, repair, improvement and maintenance of public highways, roads and bridges, under the authority and direction of the board of directors of state institutions and of the state engineer a sum of money shall be paid out, upon duly itemized and sworn claims, approved by the state engineer, on the state auditor, who shall draw his warrants therefor on the state treasurer, *who shall pay the same out of the general fund and the appropriation for the board of directors of state institutions for that purpose, authorized in the General Appropriation Bill;* provided, that twenty-five (25%) per centum of said sum of money shall be subject to be paid out upon authority and under the direction of the board of directors of state

institutions and the state engineer, for the payment of all salaries and expenses of whatsoever kind of the office of state engineer, and for the construction, reconstruction, repair, improvement and maintenance of public highways, roads and bridges; and seventy-five (75%) per centum of such sum of money shall be apportioned by said board of directors of state institutions to the several counties, in the amount to each county of seventy-five (75%) per centum of the taxes collected under this chapter, by said county, and such amount shall be subject to be paid out for the construction, reconstruction, repair, improvement and maintenance of public highways, roads and bridges, in the manner as in this chapter provided, within said county, upon the authority and under the direction of the county board of supervisors of such county and the state engineer, who are hereby charged with such responsibility.'' (Italics ours.)

It will be seen upon comparing this section with the previous statutes in regard to highways that it departs from the former policy of having each act contain within itself a continuing tax, apportionment, and appropriation, and lays down as a general rule for the future for the construction and maintenance of public highways that, while the *apportionment* for highway purposes is continuing, the *appropriation* must be authorized by and in the General Appropriation Bill, which in the ordinary course of affairs is passed biennially.

The second important source of revenue for road purposes raised by state taxation is what is known as the motor vehicle tax. Chapter 27 of the First Special Session Laws of 1912, afterwards carried over substantially into the Code of 1913, fixes a certain continuing license tax on all motor vehicles to be paid to the secretary of state. Paragraph 5138 of said Code directs ''the amount of the fees secured by the Secretary of State, as in this chapter pro-

vided, shall be paid into the state treasury to the credit of the state road tax fund.''

The proceeds of this tax, therefore, were divided in 1913 in the same manner and proportion as the proceeds of the property tax, under paragraph 5123, *supra,* as originally passed. No change was made in paragraph 5138, *supra,* although the method of collecting and remitting the license tax was altered somewhat from time to time. In 1922, however, the Financial Code in section 5 provided this tax should be credited to the ''state highway account, twenty-five per centum apportionment, in the general fund.''

The third great source of highway funds, the gasoline tax, was first provided by chapter 116, Session Laws of 1921, which established a continuing tax of one cent per gallon to be paid, after deducting certain expenses, to the state road tax fund, and necessarily to be apportioned to the two accounts in the same manner as the property and motor vehicle taxes. In 1922, though, the Financial Code in section 5 thereof diverted the gasoline tax from the road tax fund, which was then abolished as a separate fund, and placed it in the general fund, to be credited to the twenty-five per cent apportionment account.

From the foregoing history of legislation in regard to the chief sources of state-wide revenue for road purposes it appears that, after various changes from 1912 on, the legislature of 1922 declared in the Financial Code that the three taxes discussed were in the future to be apportioned permanently thus: The property tax, twenty-five per cent to what was known as the ''25 per cent. apportionment account,'' to be expended under the discretion of the state authorities, and seventy-five per cent to what was known as the ''75 per cent. apportionment account,'' to be expended under the direction jointly of the respective county supervisors and the state en-

gineer, and the gasoline and motor vehicle taxes to the twenty-five per cent apportionment account.

Such was the *apportionment* of the three funds, but what was the effect of the Financial Code in regard to *appropriations* for the support and maintenance of the highways of the state? Certain parts of the title and body of the Code are pertinent to this question, and we quote them as follows:

"An Act . . . Providing that All Expenses of Whatsoever Kind of All State Agencies as Defined and Provided in this Act, be Paid out of the General Fund and the Appropriation for the Respective Agencies Authorized in the General Appropriation Bill; . . . Abolishing the Use of Indirect Revenue Used by State Agencies not in Consequence of an Appropriation Act Specifying a Specific Amount, Excepting Therefrom the University of Arizona, Gasoline Tax and Motor Vehicle Tax. . . .

"Section 2. When a general appropriation shall be made . . . it shall be so construed that all balances whatsoever, except the balances for roads, buildings and the University of Arizona, shall be discontinued at the close of the fiscal year next after the adjournment of the Legislature, except that portion of which is incumbered, and shall no longer be applicable to the purposes of the original appropriation. . . . "

"Section 5. . . . No money belonging to, or for the use of the state, shall be expended or applied by any state agency, except as appropriated, unless otherwise herein authorized; provided that, all moneys received by the university and normal schools . . . shall be credited immediately upon receipt by the state treasurer to their respective accounts in the general fund, . . . and that all fees and taxes received from the licenses of motor vehicles and the gasoline tax, shall be credited, immediately upon receipt by the state treasurer, to the state highway account, twenty-five per centum apportionment, in the general fund. . . . "

"Section 9. The phrase 'out of the general fund and the appropriation for,' when and wherever used in this act, shall not be construed to mean, that the appropriation contemplated, constitutes a specific or special fund, and the same shall remain an unsegregated part of the general fund, subject to application to the purposes of such appropriation, authorized in the General Appropriation Bill. . . . "

"Section 14. When and wherever the words 'credit,' 'appropriation,' or words of similar meaning or import are used in this act, or in any law of this state, providing an appropriation of money payable from the general fund, they shall not be construed to mean that a special or specific fund is created within the general fund, and the credit authorized, and the appropriation provided shall remain an unsegregated part of the general fund, subject to application to the purpose of such credit or appropriation, authorized by law."

It is the duty of the court in construing an act to give such an interpretation to all sections thereof, if possible, that it can take effect as a harmonious whole, and carry out the purpose of the legislature. It appears to us on careful examination and comparison of the sections quoted, including section 126 set forth hereinabove, that the purpose and effect of the Financial Code was as follows: First, to abolish all continuing appropriations and special funds, except those expressly set forth in section 3 of the act; second, to provide that all expenses for every kind of state agency not chargeable to one of the twenty special funds named in section 3 be paid out of the general fund, and *through appropriations authorized only in the General Appropriation Bill;* third, to enact that indirect revenue could not be used, unless a specific amount was appropriated from it, except that the proceeds of certain indirect taxes might be appropriated *in toto* for the University of Arizona and the highway account, without the amount appropriated being specified; fourth, to order that,

after the passage of each general appropriation bill, at the end of the current fiscal year after the legislature adjourned any balance unspent or unencumbered of an appropriation previously made should lapse and return to the general fund, except that balances of such appropriations made for the University of Arizona, the roads, or for building purposes of any nature, should be carried over and be used in ensuing fiscal years. We think this is the only reasonable interpretation of the language of the Financial Code when it is considered together with its title.

This construction is borne out by the subsequent action of the same legislature which adopted the Financial Code. In the General Appropriation Bill of 1922, subdivision 18 thereof appropriates specifically from the general fund a property tax of five cents on the hundred dollars, and also the gasoline and motor vehicle taxes, which by section 5 of the Financial Code were already *credited* to the twenty-five per cent apportionment account in the general fund for the use of the highway department for the fiscal year ending June 30th, 1923. It also appropriates for the use of the University of Arizona not only the eighty-five one-hundredths of a mill property tax referred to in section 128 of the Financial Code, but also all moneys received by the University and already provided to be credited to it under section 5 of the Financial Code. Evidently the legislature of 1922 did not think that Code of itself appropriated any of these taxes, but believed their expenditure must be specifically authorized in the General Appropriation Bill.

Taking all these things into consideration, we are satisfied that the Financial Code of itself makes no appropriation whatever for the support of the highway department, and that any appropriations authorizing the expenditure of money must appear in

some other act. We do not wish to be understood as saying that a subsequent legislature cannot alter this method of making appropriations,—on the contrary, it has full power to do so, and did exercise such power in chapters 25 and 76 of the Session Laws of 1923, but, except as they are altered or repealed, or are inconsistent with later legislation, the provisions of the Financial Code must still govern.

In the spring of 1923 the legislature met in regular session. It early appeared that the highway department was in financial difficulties, and an investigating committee of the legislature finally reported that at least a million and one-half dollars would be needed as an immediate appropriation to take care of the commitments and contracts already made by the department. With this situation in view the committee recommended the introduction of what is known as Senate Bill 156, which, with some extremely important modifications, was afterwards enacted into law as chapter 76, Session Laws of 1923. This bill, when originally introduced, as appears from the Journals of the House and Senate of that year, was intended solely as an emergency measure for the temporary financing of the highway department so as to pay the expenses of certain very specific projects to which the state was committed, which were named within the bill, and all of the taxes levied by the terms of the bill were to be placed in the twenty–five per cent apportionment account, which, as we have indicated, had previously always been expended under the direction of the state authorities alone. It appears, however, from the same sources, that, when the bill reached the House, it was amended in some most important particulars. The property tax levied thereby was increased to ten cents on the hundred dollars, and, instead of being placed in the twenty-

five per cent apportionment account alone, one-fourth thereof only was so placed, and the remaining three-fourths was directed to be apportioned to the seventy-five per cent apportionment account.

The mill tax was altered in its amount, and was "deposited in" the twenty-five per cent apportionment account, while the gasoline tax, instead of being "credited" entirely to the twenty-five per cent apportionment account, as had been provided by the Financial Code, had one-quarter only "placed in" that account, and one-quarter in the seventy-five per cent apportionment account, while fifty per cent was ordered turned over to the supervisors of the various counties in proportion to the amount of the tax raised in such counties, with express authority to the supervisors to use it for the maintenance of county roads. This occurred almost at the last moment of the session, and the bill as finally presented to the Governor and filed by him in the office of the Secretary of State was so interlined and mutilated that the latter officer refused to print it in the usual manner in the official Session Laws, using instead photostatic copies of a considerable portion of it. The Governor attempted to veto certain parts of the bill, his principal purpose, as expressed in his veto message, being to restore it to its original form so far as devoting all the proceeds of the various taxes levied thereby to the twenty-five per cent apportionment account was concerned. But this court in the case of *Black & White Taxicab Co.* v. *Standard Oil Co.*, 25 Ariz. 381, 218 Pac. 139, held the veto unconstitutional and the act to be a law as finally adopted by the legislature.

We did not pass, however, on the questions involved in this particular case; and its construction, so far as these matters are concerned, is therefore an open issue. The act itself is extremely lengthy, and we therefore quote only the portions which we

consider necessary for the purposes of the case. They read as follows:

"An Act to Provide funds for the Construction and Completion of Certain Designated Highway Projects, . . . Authorizing the Refunding, for use on any Specific or Designated Highway Project, of Funds Paid . . . for the Construction of Such Specific and Designated Highway Projects and Diverted, . . . to Purposes Other than Such Specified and Designated Projects: Making an Appropriation Therefor.: Providing for the Raising of Funds to Meet Such Appropriation by Means of 25% Apportionment of State Road Tax.

"Section 1. For the purpose of construction and completion of those certain highway projects hereinafter specified, . . . and for the purpose of refunding for use on specific and designated highway projects . . . the following appropriations, transfers and funds, limitations and authorizations of expenditure of funds and appropriations are made.

"Section 2. For the purpose of refunding for use on the specific and designated highway projects, hereinafter named, . . . the state treasurer is hereby authorized and directed, . . . to make transfers out of any moneys in the 25% apportionment account in the general fund of the state of Arizona, as follows. . . .

"Section 3. All monies received from the United States of America, . . . for the construction of any of the projects named in section 2 of this act, . . . shall, when received by the treasurer of the state of Arizona, be by him deposited to the credit of the respective segregated accounts . . . on account of which such monies were so paid by the United States of America.

"Section 4. The monies in any of such segregated accounts, as provided in sections 2 and 3, of this act, shall be paid out, for and only for, the purposes as following:

"First: The reimbursement of the state of Arizona for any expenditures by it in the construction of such project. . . .

"Second: For the construction and completion of such project. . . .

"Provided, that, when the above purposes are fully satisfied, any balance remaining in such segregated account, shall be transferred, by the auditor and treasurer of the state of Arizona, to the 25% apportionment account, within said general fund, and may thereafter be available for expenditure for the purposes of such account, as authorized by law. . . .

"Section 5. There is hereby appropriated from the funds and monies hereafter in this act created or designated, the sum of $1,550,000.00 dollars, which shall be paid when and as available to the credit of said 25% apportionment account, in said general fund, to be expended for, and only for the following purposes:

"First: The refunding for use on any specific or designated highway project of funds paid . . . for the construction of such specific and designated highway project, and diverted . . . to purposes other than the construction of such specific and designated project. . . .

"Second: For the construction and completion of those certain highway projects, . . . named and described as follows: [Naming some forty-eight specific road projects.]

"Section 6. Said board is hereby authorized to enter into agreements with any political subdivision of this state, . . . for the use by the state of Arizona, of bond or other monies of such political subdivision, for the construction and completion of the road projects, enumerated in section 5, of this act, or for other projects as may be approved by such board. . . .

"On or before the date or dates provided in such contract, . . . such political subdivision shall cause to be deposited the amount of money agreed upon with the treasurer of the state of Arizona, who shall deposit the same in a segregated account within said general fund, in favor of such road project. . . .

"The moneys in any of said segregated accounts, as provided in this section, shall be paid out for and only for, the purposes as follows:

"First: The reimbursement of the state of Arizona for any expenditures by it in the construction of such project. . . .

"Second: For the construction and completion of such project. . . .

"Provided, that, when the above purposes are fully satisfied, any balance remaining in such segregated account, shall be transferred, by the auditor and treasurer of the state of Arizona, to said 25% apportionment account, within said general fund, and may thereafter be available for expenditure from that account, for the purpose of such account, as authorized by law. . . .

"Section 10. For the purpose of providing said sum of $1,550,000.00, appropriated in section 5 of this act, the following monies, funds and license taxes are hereby designated and created:

"Subdivision I.

"(a) There shall be annually levied and collected in the manner in which other state taxes are levied and collected, . . . a tax of ten (.10) cents on each one hundred ($100.00) dollars, of the assessed valuation of taxable property within the state, for the purpose of the construction, reconstruction, repairing, improving and maintaining state highways and bridges, as follows:

"25% of such tax, herein provided for, shall be as paid into the treasury of the state of Arizona, deposited by the treasurer of the state of Arizona, in a separate account, in the general fund of the state, to be known and designated as 25% apportionment account.

"Seventy-five per cent (75%) of such 'state road tax fund, herein provided for, shall be apportioned to the several counties in the amount to each county of seventy-five per cent of the taxes collected under this act, by said county, and such amount shall be subject to be paid out for the construction, reconstruction, repair, improvement and maintenance of public highways, roads, and bridges in the manner as in this act provided for the work in this act provided for within such county upon the authority and under the direction of the county board of super-

visors of such county and the state engineer who are hereby charged with such responsibility.

"Subdivision II.

"(a) There hereby is authorized to be levied and collected a (one-half mill) tax per each scheduled passenger capacity mile. . . .

"(b) There hereby is authorized to be levied and collected a (two mill tax) per each scheduled truck ton capacity. . . .

"(c) Such (one-half mill) tax . . . and such two-mill tax . . . shall be levied only upon those common carriers operating motor vehicles . . . which said money . . . shall be immediately when received, transferred . . . to the treasurer of the state of Arizona, who shall deposit the same in said 25% apportionment account in the general fund of state. . . .

"Subdivision III.

"(a) That each and every dealer, . . . who is now engaged . . . in the sale, use or distribution, . . . of gasoline or other distillates of crude petroleum shall . . . collect a license tax of three (3) cents per gallon on all gasoline and other distillates of crude petroleum so sold, used or distributed. . . .

"(d) Said license tax shall be paid . . . to the secretary of state, who shall receipt to the dealer therefor, and promptly turn over to the state treasurer as are other receipts of his office, and the state treasurer shall place one-quarter of the same in said 25% apportionment account in the general fund and one-quarter of the same to the account of the 75% apportionment account of the general fund, and said secretary of state shall promptly pay the remaining one-half of such tax to the several county treasurers of the state of Arizona. . . .

"Section 11. Any monies remaining in said 25% apportionment account, in the general fund, after the performance of all things required to be done in this act and after the construction and completion of all road projects enumerated in this Act, and all monies accruing to said 25% apportionment account thereafter, shall be available for the purpose of such account, as authorized by law. . . .

"Section 16. The monies herein appropriated, and provided to be paid in to said 25% apportionment account except as provided in section 11 of this act, shall be paid out in payment of the costs of construction, including overhead and engineering, *of the road projects herein enumerated. . . .* " (Italics ours.)

It will be noted that, while the act recognized the principle theretofore existing of the twenty-five per cent apportionment account and the seventy-five per cent apportionment account, there was a highly significant change in the language used in regard to the former from that which had appeared in all previous legislation. In all other statutes which created or continued that account it was always provided it should be "subject to be paid out upon authority and under the direction of the board of directors of state institutions and the state engineer, for the payment of all salaries and expenses of whatsoever kind of the office of state engineer, and for the construction, reconstruction, repair, improvement and maintenance of public highways, roads and bridges; . . . " and the provision in regard to the seventy-five per cent fund was that it should be "subject to be paid out for the construction, reconstruction, repair, improvement and maintenance of public highways, roads and bridges, in the manner as in this chapter provided, within said county, upon the authority and under the direction of the county board of supervisors of such county and the state engineer, who are hereby charged with such responsibility." Laws 1922, chap. 35, § 126.

In chapter 76, *supra,* the twenty-five per cent apportionment account, however, was governed by the following language:

"25% of such tax, herein provided, for, shall be as paid into the treasury of the state of Arizona, deposited by the treasurer of the state of Arizona, in a separate account, in the general fund of the

state, to be known and designated as 25% apportionment account,"

—which gives no authority to spend the money, while the seventy-five per cent apportionment account followed the old usage of granting such authority. The reason for the changed language may be readily determined from the report of the committee which introduced the bill.

The act as finally passed levied certain taxes which were apportioned to the twenty-five per cent apportionment account as follows: (1) One-fourth of the state road tax of ten cents on the hundred dollars; (2) all of the passenger and freight mill tax; (3) one-fourth of the three-cent gasoline tax; (4) the balances remaining over after the completion of the projects named in sections 2, 3, 5 and 6 of the act. The only specific authorizations to spend anything from the twenty-five per cent apportionment account are found in sections 2 and 5 of the act. These authorizations apply, first, to the refund of any diverted funds; and, second, to the construction of some forty-eight named projects, but a limitation of $1,550,000 is placed on the total appropriation for such purposes.

It is contended by plaintiffs, however, that section 11 of the act authorizes the expenditure of all balances and sums accruing to the twenty-five per cent apportionment account after the completion of the specified projects named in the act, presumably for general highway purposes. Said section reads as follows:

"Section 11. Any moneys remaining in said 25% apportionment account, in the general fund, after the performance of all things required to be done in this act and after the construction and completion of all road projects enumerated in this act, and all moneys accruing to said 25% apportionment ac-

count thereafter, shall be available for the purpose of such account, as authorized by law.''

Is such contention tenable?

It is evident from the language of section 11 that there is no authority contained within chapter 76, *supra*, for the expenditure of these balances, for the section expressly says that it refers to moneys remaining ''after the performance of all things required to be done in this act''; and, further, nowhere in the act can there be found any provision declaring the purposes of the twenty-five per cent apportionment account to be anything except the construction of the particular projects specifically named in the act, or granting authority to use the account for anything else. The very careful and guarded language in regard to the twenty-five per cent apportionment account, so different from that used repeatedly and continuously in previous legislation on the same subject, shows clearly that the legislature did not intend chapter 76, *supra*, to make any appropriation of the twenty-five per cent apportionment account, beyond the express projects mentioned therein. If, therefore, there is another purpose ''authorized by law'' for such account, it must be found within some previous statute. The only previous statute in force and dealing with this account is the Financial Code, and, as we have said, the express purpose and language of that Code is that no money can be paid out of the twenty-five per cent apportionment account, except from ''the appropriation for the board of directors of state institutions for that purpose, authorized in the General Appropriation Bill.''

We are therefore of the opinion that the effect of section 11, *supra,* is to declare that such balances and future funds shall be available for the purposes of the twenty-five per cent apportionment account when and as authorized by the only law applying

thereto, to wit, the Financial Code of 1922, and that such Code authorizes expenditures from that fund when and only as authorized in the General Appropriation Bill.

The language of chapter 76, *supra,* in regard to the seventy-five per cent apportionment account, however, is very different. It provides expressly for the expenditure of such account for the purposes set forth in section 6 of the act, and covers, not only the specifically enumerated projects, but any others that may be approved by the board of directors of state institutions and the supervisors of the different counties. *Koch* v. *Johnson,* 30 Ariz. 14, 243 Pac. 611.

The appropriation on its face is a continuing one. So far as the fifty per cent of the gasoline tax paid directly to the counties is concerned, they are authorized to use it indefinitely for the maintenance of county roads and highways. We have therefore a continuing *apportionment* of all of the taxes created by chapter 76, *supra,* but a continuing *appropriation* only of the seventy-five per cent apportionment account and of the fifty per cent of the gasoline tax going directly to the counties. What is the effect of such a situation upon the taxes so levied? Do they continue, or have they expired by operation of law?

Section 10, as it appeared originally in the act introduced, named the object of the various taxes established thereby as being "for the purpose of providing said sum of $1,550,000.00, appropriated in section 5 of this act the following monies, funds, and license taxes are hereby designated and created. . . . "

Since the taxes as they appeared in the original bill were appropriated entirely to the twenty-five per cent apportionment account, the purpose above quoted was in perfect harmony with the appropriating portion of section 5, which reads:

"There is hereby appropriated from the funds and moneys hereafter in this act created or designated, the sum of 1,550,000.00 dollars, *which shall be paid when and as available to the credit of said 25% apportionment account, in said general fund. . . .* "

The legislature, however, at the last moment changed the application of the taxes, so that the purpose thereof was not only to raise the $1,550,000, but to apportion seventy-five per cent of both the property and gasoline taxes to entirely different purposes, and to authorize their expenditure for such purposes as a continuing appropriation, for they were not limited to the receipts of any particular years as is provided in the General Appropriation Bill biennially.

The gasoline tax now exists in all but a very few states in the Union. In all of these states, while the amount fluctuates, the tax itself is considered a permanent one. Since the beginning of statehood a property tax for road purposes in some amount has always been levied. While the amount has varied, it has been accepted as the policy of the state that some tax of this nature should exist, as much as the tax for the university or the public schools.

In view of all of the foregoing reasons, we should hesitate to hold it to be the intention of the legislature that taxes which have ever since their first levy been continued for road purposes were intended to expire, unless the language of the statute so requires. As we have pointed out, nowhere in chapter 76, *supra,* is it expressly stated that these taxes shall terminate at any particular period, while the language used in establishing them on its face contemplates continuous taxes. The only argument to the contrary which could be drawn from the text of the act is based on the theory that the $1,550,000 is the only appropriation therein contained, and that, when it

ceases, the purpose of the law having been fulfilled, the tax is at an end. But, as we have shown, that is far from being the only appropriation, and the argument therefore fails.

It is urged, however, that, if such be the construction of the act, it violates the provision of section 9, article 9, of the Constitution of Arizona, which reads as follows:

"Section 9. Every law which imposes, continues, or revives a tax shall distinctly state the tax and the objects for which it shall be applied; and it shall not be sufficient to refer to any other law to fix such tax or object,"

—in that, if we hold the portion of the taxes which goes to the twenty-five per cent apportionment account has not been appropriated, there is no object in chapter 76, *supra,* to which such taxes can apply and it is not sufficient under the constitutional provision that a reference is made to another statute for their purpose. There are many other states which have constitutional provisions similar in a general way to ours, and it seems to be pretty well settled that the proper construction of such constitutional provisions providing that no tax shall be imposed, continued, or revived unless the law distinctly state its object, applies to a property and not an excise tax. Such is the holding of the cases of *McGannon* v. *State,* 23 Okl. 145, Ann. Cas. 1914B 620, 124 Pac. 1063, *In re McKennan,* 25 S. D. 369, 33 L. R. A. (N. S.) 606, 126 N. W. 611, and *In re McPherson,* 104 N. Y. 306, 58 Am. Rep. 502, 10 N. E. 685.

In the latter case the court said:

"It is always uncertain upon whom it will fall [referring to inheritance tax] and how much revenue it will produce. It would have been impossible for the Legislature, perhaps years in advance, to specify the particular objects to which the tax should be applied, and we are of opinion that this section of the Constitution was intended to apply to the

annual recurring taxes known at the time of the adoption of the Constitution and imposed generally upon the entire property of the state.''

In all the cases in which the above rule is announced an inheritance tax was involved, but, in passing upon the constitutional provisions like section 9, article 9, *supra,* the general observation seems to be that the legislature is required to specify the object of the levy only when it is upon the general property of the state. The same rule seems to have been made in *Missouri, etc.,* v. *Meyer* (D. C.), 204 Fed. 140, wherein the question was the right of the state to levy and collect a tax upon coal output, the court quoting from the McGannon case, in this language:

''It is intended to apply only to annually recurring taxes imposed generally upon the entire property of the state and not the kind of tax we are dealing with, which is a special tax.''

The gasoline and mill taxes are therefore not within the constitutional provision, as they are excise, and not property taxes. *Texas Co.* v. *State,* 31 Ariz. 485, 254 Pac. 1060.

In so far as the ten cent property tax is concerned, the statute expressly states that it is levied ''for the purpose of construction, reconstruction, repairing, improving and maintaining state highways and bridges.'' This is a very distinct and specific statement of the object of the tax, and the Constitution does not require that an appropriation be made, but only that the object for which it shall be applied appear. None of the three taxes in question, therefore, are obnoxious to the constitutional provision, even though portions thereof have not yet been appropriated.

The gasoline tax thus being a valid, subsisting, and continuing tax, of which one-fourth is directed to be credited to the twenty-five per cent apportion-

ment account, and the same amount to the seventy-five per cent apportionment account, it is the duty of the state treasurer to make such credit of any of that tax as it comes into his possession, paying out that part apportioned to the seventy-five per cent apportionment account in the usual manner, and retaining that part apportioned to the twenty-five per cent apportionment account until the legislature direct its expenditure.

It is ordered that the alternative writ heretofore issued be made permanent.

ROSS, C. J., concurs.

McALISTER, J. (Concurring in Part, Dissenting in Part).—I concur in the judgment directing the state treasurer to deposit in the twenty-five per cent apportionment account of the general fund the funds which chapter 76 provides shall be placed to the credit of that account, namely, one-fourth of the money paid into the state treasury from the ten cent property levy, one-fourth of the gasoline license tax, and all of the truck and passenger mill tax. It is clear that in the passage of this act the sixth legislature intended that all three of these taxes should be collected until a subsequent legislative body should provide otherwise. While it is in all probability true that the act was framed and passed to give the highway department temporary and emergent relief, yet it contains nothing justifying the conclusion, or even suggesting, that it was enacted for a definite period only, or that it would cease to be operative or become *functus officio* upon the happening of some particular event. Hence I am in full accord with the forceful statement of Judge LOCKWOOD relative to the continuing character of the taxes it directs to be collected.

It is likewise true, as held in this opinion, that the proportion of these taxes which the law directs

to be placed in the seventy-five per cent apportionment account, namely, three-fourths of the 10¢ property levy and one-fourth of the gasoline license tax, is appropriated by the terms of the act itself, and therefore that authority exists for its use without further act of the legislature. It is also correct that the fifty per cent of the gasoline license tax apportioned to the counties is appropriated by the terms of the act, and that nothing further is required to authorize its use by the supervisors of the various counties.

The majority are of the view, however, that neither the act itself nor any other provision of the statute appropriates the funds in the twenty-five per cent apportionment account other than the $1,550,000 which it provides shall be paid out for the purposes therein enumerated, and hence that no authority exists for the use of the monies which it is held are to continue to be placed to the credit of this account after this $1,550,000 has been raised and expended. One-fourth of the property and gasoline and all of the mill tax will flow without ceasing into this account, but under the view of the majority they must rest there until their use is authorized by an appropriation in a general or special appropriation bill to be enacted at some future time. The reasoning on this phase of the case is strong, but somehow I am unable to escape the conclusion that it was intended that the funds in the twenty-five per cent apportionment account should, if needed, be used as collected for the purposes of that account and not remain idle until the legislature at some later date should authorize their use in a general or special appropriation bill—perhaps six months or a year after they have begun to accumulate and the highway department has been closed for a lack of operating funds. This would undoubtedly be at the succeeding biennial session, unless a special one were had before

that time and the legislature continued the policy inaugurated in chapter 76 of making a special appropriation for the highway department, since the occasion for making general appropriations would not likely arise before that time, the other departments of the state government having been cared for in the previous legislature. The general purview of the act, therefore, and the language used in paragraph 11, are such that it is difficult for me to believe that those responsible for this legislation had in mind that, after the $1,550,000 it specifically appropriates from the twenty-five per cent apportionment account had been expended, the funds thereafter accruing to the credit of this account should not be spent without further authorization for the purpose for which it was created and still exists.

A proper construction of the act as a whole and of paragraph 11 especially, which we quote again for convenience, leads, in my opinion, to this conclusion. It reads:

"Any monies remaining in said 25% apportionment account, in the general fund, after the performance of all things required to be done in this act, and after the construction and completion of all road projects enumerated in this act, and all monies accruing to said 25% apportionment account thereafter, shall be available for the purpose of such account, as authorized by law."

In using the words "all moneys" in the phrase, "all monies accruing to said 25% apportionment account thereafter," the legislature undoubtedly had in mind the property, gas and mill tax which it is agreed should continue to be collected, because there is no other place for it to go, and no other source from which monies could accrue to this account, the performance of the things required to be done in the act having been completed or the funds designated therefor having been expended, and, in

the remainder of the sentence, "shall be available for the purpose of such account, as authorized by law," it provided what should be done with these monies after they had been placed in this account. The word "available" has practically the same meaning as the expression "subject to be paid out" in subdivision 1, section 10, which, it is admitted, constitutes an appropriation of the funds in the seventy-five per cent apportionment account. Webster's New International Dictionary gives, among other definitions of it, "usable," and Funk & Wagnall's Practical Standard Dictionary "at one's disposal, as funds." Hence it would seem that, when funds are said by the legislature to be available for a certain purpose, or at the disposal of those whose duty it is to handle them, nothing is required to render the spending of them lawful, except to apply them to that purpose, and therefore, when this has been done, they have been expended "as authorized by law" within the meaning of this expression in section 11. It was not, as I view it, intended by the language "as authorized by law" that some other statute appropriating the funds accruing to the twenty-five per cent apportionment account should exist before it could be said that their expenditure is properly authorized. In other words, it was not meant that it should be construed as though it read, "as authorized in some existing or future appropriation bill," because, to my mind at least, it does not convey this impression, and for the further reason that in the very act in which it appears the legislature departed from the policy inaugurated the year before of taking care of the highway department in the general appropriation bill. The members of the legislature realized that the twenty-five-seventy-five per cent system in practically the same form as when it was inaugurated in 1912 was still in full force and effect, and consequently it

must have intended by this language that the provisions of the statute which continue this account should be looked to to ascertain the purpose for which the law authorizes the funds placed therein to be spent.

Looking, therefore, to the last expression of the legislature on the subject, namely, section 126, chapter 35, Special Session of the Fifth Legislature, commonly referred to as the Financial Code, we find this purpose described in the following language:

"For the payment of all salaries and expenses of whatsoever kind of the office of state engineer, and for the construction, reconstruction, repair, improvement and maintenance of public highways, roads and bridges."

Hence by reading the last ten words of section 11 in the light of this statement the purpose for which the funds in the twenty-five per cent apportionment account are available becomes plain, and leaves nothing to be supplied to bring the language within the definition of an appropriation given in the majority opinion.

It is therefore clear to my mind that the purpose of the legislature will be effectuated if the taxes which it is held are to be collected and placed in the twenty-five and seventy-five per cent apportionment accounts are applied to the purposes of those accounts until the legislature provides otherwise. To hold that they are to be collected, but that only three-fourths of the property and gasoline tax can be spent without further authorization, is to say in practical effect that none of the tax is appropriated, because, if the one-fourth of the property and gasoline and all the mill tax placed in the twenty-five per cent apportionment account is not available for the purpose of that account without further legislative action, there is nothing with which the highway department can operate, since the law requires that

all expenses of this nature shall be paid from this account. It was to prevent such an occurrence as this that the legislature provided in section 11 that, after the things required in the act to be done had been performed, that is, after the $1,550,000 appropriated for special projects had been expended thereon, the monies accruing to this account thereafter should be available for the purpose of this account.

The order of the court, therefore, should direct, not merely that the treasurer place the funds in question to the credit of this account, but that he pay them out in accordance with law.