STATE EX REL. FINNEGAN, Attorney General, Petitioner, vs. DAMMANN, Secretary of State, Defendant.

*December 6, 1935—January 7, 1936.*

For the petitioner there was a brief by the *Attorney General, Joseph G. Hirschberg,* deputy attorney general, and *H. T. Ferguson,* special assistant attorney general, and oral argument by *Mr. Ferguson.*

*W. Wade Boardman* of Madison, for the defendant.

WICKHEM, J.  This action puts in question the power of the governor partially to veto the bill here involved.  This requires the application to the facts here presented of the 1930 amendment to sec. 10, art. V, Const., which reads as follows:

"Appropriation bills may be approved in whole or in part by the governor, and the part approved shall become law, and the part objected to shall be returned in the same manner as provided for other bills."

The bill in question was No. 312, S., and was published as ch. 546, Laws of 1935.  Its title was as follows:

"An act to repeal section 194.03, subsections (4), (5), (6), (7), and (16) of section 76.54; to amend subsections (2) and (4) of section 194.04, subsection (1) of section 194.23, subsection (1) of section 194.34, the introductory paragraph of subsection (1) of section 194.41, subsection (2) and the introductory paragraph and subdivisions 1 to 4 of paragraph (a) and paragraph (e) of subsection (3) of section 76.54; and to create section 194.03, subsection (3) of section 194.05, subsection (5) of section 194.34, and subsection (16) of section 76.54 of the statutes, relating to the regulation and taxation of motor carriers."

It dealt with portions in the statutes relating to regulation of motor carriers.  The important respects in which the existing law was changed appear to have been as follows:

(1)  To permit semiannual payment of permit fees.
(2)  To increase the amount of permit fees required to be paid by certain motor carriers.
(3)  To exempt certain motor carriers from the requirement of obtaining any licenses or annual permits, and from the payment of fees therefor.
(4)  To simplify the procedure for obtaining certificates and licenses.
(5)  To simplify and alter the requirements relating to insurance policies and indemnity bonds of motor carriers.
(6)  To require all taxes levied upon the operation of motor vehicles to be assessed upon a flat rate basis, instead of a mileage basis, and changing to flat rate so prescribed.

(7) To alter the provisions relating to exemption from such taxes.

(8) To alter the provisions relating to interstate motor carriers, to permit co-ordination with federal law of 1935.

The act was submitted to the governor for approval on September 26, 1935, the date of its passage. On September 27, 1935, the legislature adjourned *sine die*. On October 3, 1935, and within six secular days after its presentation to him, the governor attached his signature to the bill, but also wrote upon the margin opposite two paragraphs thereof the words: "This is vetoed and not approved," and signed his name to each such notation. The attempted partial veto was to subsections amending sec. 194.04 (4), Stats. Sec. 194.04 (4) deals with annual permit fees for common motor carriers of passengers and property, contract motor carriers, and private motor carriers. The operation of Bill No. 312, S., was to increase the permit fees for each type of carrier. The amendments to pars. (c) and (d) of sec. 194.04 (4), which were vetoed, increased the permit fees for contract motor carriers and private motor carriers from $10 and $1, respectively, to $20 and $10, respectively.[1]

---

[1] "(4) ANNUAL PERMIT FEES. The annual permit fees required for motor vehicles operated under this chapter shall be as follows:

"(a) Motor vehicles operated by common motor carriers of passengers, . . . twenty-five dollars.

"(b) Motor vehicles operated by common motor carriers of property, . . . thirty dollars.

This is vetoed and not approved Philip F. La Follette    "(c) ~~Motor vehicles operated by contract motor carriers, except as provided in paragraph (e) of this subsection . . . twenty dollars.~~

This is vetoed and not approved Philip F. La Follette    "(d) ~~Motor vehicles operated by private motor carriers, . . . ten dollars.~~

. . .

"(e) *Motor vehicles which are operated by contract motor carriers exclusively (1) for the transportation of farm products from*

Ch. 546, Laws of 1935, was published as enacted with the exception that the text of pars. (c) and (d) of sec. 194.04 (4) was omitted, and opposite the letters designating each, was published the word "Vetoed." [2]

In the view that the court takes of this case, two questions require determination: (1) Was Bill No. 312, S., as enacted by the legislature an appropriation bill within the meaning of sec. 10, art. V, Const., and subject to partial veto by the governor? (2) If not, did the invalid exercise of the veto power by the governor render unqualified his approval of the law?

In the previous case of *State ex rel. Wisconsin Tel. Co. v. Henry,* 218 Wis. 302, 260 N. W. 486, this court·for the first time had occasion to consider the scope of the 1930 constitutional amendment. It was there held: (1) That the 1930 amendment permits the veto by the governor of any separable part of an appropriation bill; and (2) that this power to partially veto exists, although the part vetoed does not deal with appropriations. It was conceded in this case that the

---

point of production and supplies back to producers of farm products; (2) for the United States, the state or any political subdivision or agency thereof; or (3) within one municipality and municipalities contiguous thereto, ten dollars."

[2] "(4) ANNUAL PERMIT FEES. The annual permit fees required for motor vehicles operated under this chapter shall be as follows:

"(a) Motor vehicles operated by common motor carriers of passengers, . . . *twenty-five* dollars.

"(b) Motor vehicles operated by common motor carriers of property, . . . *thirty* dollars.

"(c) . . . Vetoed.

"(d) . . . Vetoed.

. . .

"(e) *Motor vehicles which are operated by contract motor carriers exclusively (1) for the transportation of farm products from point of production and supplies back to producers of farm products; (2) for the United States, the state or any political subdivision or agency thereof; or (3) within one municipality and municipalities contiguous thereto, ten dollars."*

bill under examination was an appropriation bill. Since the question here is whether Bill No. 312, S., was an appropriation bill, the doctrine of the *Telephone Case* is not determinative here.

Bill No. 312, S., concededly did not contain any express appropriation. It is contended, however, that since it amends sec. 194.04, Stats., and that since this section contained an appropriation, it must be held to be an appropriation bill. The provisions of sec. 194.04 involved in this contention are sub. (1), pars. (bd) and (cb):

"(bd) On or before the first day of January of each year each holder of a certificate shall also pay to the commission an annual fee as provided in this section for each motor vehicle permit whose renewal is desired. The fees provided for in this section shall be paid into the state treasury and are reappropriated as in subsection (5) of section 20.51.

"(cb) On or before the first day of January of each year each holder of a license shall also pay to the commission an annual permit fee as provided in this section for each motor vehicle whose renewal is desired. The fees provided for in this section shall be paid into the state treasury and are reappropriated as provided in subsection (5) of section 20.51."

Implicit in this contention is the further claim that a bill containing any appropriation is an appropriation bill. It is at once apparent that debatable contentions may be made, (1) to the effect that any bill containing an appropriation is an appropriation bill; and (2) that in order to constitute an appropriation bill, the act must predominantly deal with the subject of appropriations. We do not find it necessary to determine the questions involved in these conflicting views.

Assuming without determining that the first contention is sound, we are met with the fact that this bill does not within its four corners contain an appropriation. Does the fact that it indirectly affects continuing revolving fund appropriations theretofore enacted by raising the permit fees of various

types of carriers, constitute it an appropriation bill? We are, convinced that this question must be answered in the negative. To answer it otherwise would extend the scope of the constitutional amendment far beyond the evils it was designed to correct. The paragraphs vetoed are revenue raising measures and as conceded in the defendant's brief, ". . . taxation and appropriation are more nearly antonyms than synonyms. . . ."

In Webster's New International Dictionary the following definition is made:

"Appropriation bill. Govt. A measure before a legislative body authorizing the expenditure of public moneys and stipulating the amount, manner, and purpose of the various items of expenditure."

In *State v. La Grave,* 23 Nev. 25, 41 Pac. 1075, 1076, the court said:

"An appropriation in the sense of the constitution means the setting apart a portion of the public funds for a public purpose."

In *Hunt v. Callaghan,* 32 Ariz. 235, 257 Pac. 648, 649, the court said:

"An appropriation is 'the setting aside from the public revenue of a certain sum of money for a specified object, in such manner that the executive officers of the government are authorized to use that money, and no more, for that object, and no other.' "

The act under examination satisfies none of these definitions. It seems to us that since the constitutional amendment deals with appropriation *bills,* the bill itself must satisfy the constitutional requisites, and that it does not do this merely because its operation and effect in connection with an existing appropriation law has an indirect bearing upon the appropriation of public moneys.

It is appreciated that a genuine difficulty is presented, arising by reason of the practice of creating revolving fund ap-

propriations which are continuing in character. It may be that such a practice impairs to some extent the power of the governor effectively to reach objectionable appropriations by exercise of the partial veto. If this is an evil, however, it cannot be remedied by giving a distorted meaning to the term "appropriation bill."

It seems to us that Bill No. 312, S., could not without distortion be held to be such a bill. It deals with appropriations neither in the title nor in the body of the act, and would not be considered such a bill either in common speech or in the language of those who deal with legislative or governmental matters.

We conclude, therefore, that the attempted veto was ineffective because the subject matter of the bill did not fall within the constitutional provision authorizing a partial veto. In view of this conclusion, it is unnecessary to consider other objections to the validity of the veto, predicated upon the assumption that Bill No. 312, S., was an appropriation bill.

The next question is as to the effect of the partial veto. We have been favored with able argument to the effect that the veto being a nullity, the approval of the governor must be considered as unqualified. We are satisfied that this contention is not sound. It is conceded by both plaintiff and defendant that in order to become a law this act required the governor's approval. Both sound principle and the decisions bearing upon the question establish that whether or not an invalid partial veto results in an act being in force or wholly inoperative, depends entirely upon whether the act could become a law without the governor's sanction and approval, or whether it required this approval before it could become law. In the former case, the partial veto being ineffective as a veto and no approval being required, the law is in force. In the latter case, an express approval of the law as enacted being required and only a qualified approval given, the act wholly fails. *Nowell v. Harrington*, 122 Md. 487, 89 Atl. 1098;

*Wood v. State Administrative Board,* 255 Mich. 220, 238 N. W. 16; *Mills v. Porter,* 69 Mont. 325, 222 Pac. 428, 35 A. L. R. 592; *State ex rel. Jamison v. Forsyth,* 21 Wyo. 359, 133 Pac. 521; *State ex rel. Teachers & Officers of Ind. Inst. and College v. Holder,* 76 Miss. 158, 23 So. 643; *Regents of State Univ. v. Trapp,* 28 Okla. 83, 113 Pac. 910.

However invalid and nugatory the veto may have been, it did in fact operate to destroy the unequivocal character of the governor's approval. This question is not to be answered by conjecture or speculation whether the governor would or would not have signed the act had he correctly determined the extent of his powers partially to veto it. The question is whether, as a matter of fact, the bill as enacted had the governor's approval. The partial veto, however invalid, indicates that it did not.

Since the act required the approval of the governor, and did not receive it, the conclusion is inevitable that Bill No. 312, S., never became a law and *mandamus* does not lie to compel its publication by the defendant.

*By the Court.*—Writ denied.