FRED A. RISSER, Chairman, Senate Organization Committee
The Senate Organization Committee has requested my opinion on the constitutionality of the action taken by Governor Schreiber in exercising the partial veto on Assembly Bill 664, which became ch. 107, Laws of 1977, relating to campaign financing.
Correspondence attached to the opinion request indicates that there are four grounds for challenging the constitutionality of the Governor's partial vetoes:
1. That the proposal was not an appropriation measure within the meaning of the constitution.
2. That the vetoes constituted affirmative legislation in contravention of the legislative power granted solely to the Legislature.
3. That the vetoes concerning the source of the money and the applicable effective date were conditions placed upon the appropriation and thus not subject to the partial veto according to the constitution.
4. That the vetoes change the source of the funding from an "additional" to a "check-off" and had the effect of increasing the appropriation and thus were an invalid exercise of the partial veto.
Chapter 107, Laws of 1977, amended certain statutes relating to elections, including statutes relating to campaign financing, created an election campaign fund and made appropriations. Those portions *Page 311 
of the chapter dealing with appropriations are secs. 46, 47, 48, 50 and 53.
State ex rel. Finnegan v. Dammann, 220 Wis. 143, 148,264 N.W. 622 (1936), has several approved definitions of an appropriation including, "`An appropriation in the sense of the constitution means the setting apart a portion of the public funds for a public purpose.'" Section 47 of ch. 107, Laws of 1977, creates sec. 20.510 (1)(q) of the statutes to read:
 "Wisconsin election campaign fund. As a continuing appropriation, from the Wisconsin election campaign fund, the moneys certified under s. 71.095 (2) to provide for payments to candidates under s. 11.50."
Other parts of the law direct the manner in which these funds are to be collected and expended. In my opinion, ch. 107, Laws of 1977, is an appropriation measure within the meaning of the constitution.
With respect to the claim that the partial vetoes constituted affirmative legislation, the supreme court has recognized that the Governor has a constitutional role in legislation. In Stateex rel. Sundby v. Adamany, 71 Wis.2d 118, 134, 237 N.W.2d 910
(1976), the court said:
 "Some argument is advanced that in the exercise of the item veto the governor can negative what the legislature has done but not bring about an affirmative change in the result intended by the legislature. We are not impressed by this argued distinction. Every veto has both a negative and affirmative ring about it. There is always a change of policy involved. We think the constitutional requisites of art. V, sec. 10, fully anticipate that the governor's action may alter the policy as written in the bill sent to the governor by the legislature."
In light of this decision, it is my opinion that even though the effect of the vetoes may be affirmative legislation, altering the policy as written by the Legislature, this is still within the Governor's constitutional powers.
The claim that the vetoes concerning the source of the money and the applicable effective date were conditions placed by the Legislature on the appropriation and thus not subject to the partial veto is not so easily answered. This challenge undoubtedly stems from *Page 312 
conclusions reached in two Attorney General opinions, i.e., 62 Op. Att'y Gen. 238 (1973) and 63 Op. Att'y Gen. 313 (1974). These opinions were mentioned but not "considered" by the court inState ex rel. Sundby v. Adamany, supra, p 131. The court said:
 "Petitioner argues that recent opinions of the attorney general indicate that a governor cannot veto a portion of an appropriation bill altering an appropriation figure, or striking down a condition imposed on the amount appropriated. We do not need to consider these opinions or the propositions they stand for because there is no question in this case that the governor neither altered an appropriation nor removed a contingency or condition on the amount appropriated. Thus this controversy is controlled by the law as stated in Henry, Martin, and Finnegan." (Emphasis added.)
But here, however, by the partial veto the Governor has altered an appropriation and has removed a contingency or condition on the amount appropriated. The effect of the partial veto of sec. 51 is to increase the amount appropriated. Assembly Bill 664, as enacted by the Legislature, provided that all individuals filing income tax statements may designate that "their income tax liability be increased by $1 for deposit into the Wisconsin Election Campaign Fund for the use of eligible candidates under s. 11.50." After the partial veto, that portion of the law provided that every individual filing an income tax statement may designate $1 for the Wisconsin Election Campaign Fund for the use of eligible candidates under sec. 11.50. This is a change of significant magnitude. Under the Legislature's version, normal income tax revenues would not be reduced but could be increased by $1 at the option of every individual filing a return, and any such increase was to be deposited (appropriated) into the Wisconsin Election Campaign Fund. Under the Governor's version the general income tax revenues would effectively be reduced to the extent that individuals would designate $1 of their income tax liability for the Wisconsin Election Campaign Fund. For convenience, the Legislature's method of providing the funds may be called a tax surcharge program, and the Governor's method may be called a check-off program.[1] *Page 313 
In 63 Op. Att'y Gen. 313 (1974) at p. 315, my predecessor said:
 "Section 3, as passed by the legislature, would appropriate for enforcement purposes the lesser of $130,000 or the amount interest earned from snowmobile registration fees. The effect of the veto would be to appropriate, in any year, $130,000 for enforcement regardless of the amount of interest earned on registration fees, assuming those fees total more than $130,000. Thus, a contingency or condition on the amount appropriated in any year was removed by the partial veto. Therefore, such a partial veto was not authorized by Art. V, sec. 10, Wis. Const., and was invalid." (Emphasis added.)
In State ex rel. Sundby v. Adamany, supra, at p. 135, the court said:
 "We conclude the action taken by the governor was valid, in that the portions vetoed, although not actually items of appropriation, were separable provisions, not constituting provisos or conditions to an item of appropriation, and the remaining portions constitute a complete and workable law. . . ." (Emphasis added.)
Since the court did not need to determine whether there were any provisos or conditions to an item of appropriation, and had previously so stated, it is my opinion that the inclusion of the language *Page 314 
underscored above was an approval by dicta, of the "provisos or conditions to an item of appropriation" test mentioned in 63 Op. Att'y Gen. 313 (1974). The Legislature had imposed a condition upon the appropriation, i.e., that the funds to be appropriated were to be derived from a voluntary, additional income tax (surcharge).[2] The Governor's partial veto of sec. 51 of ch. 107, Laws of 1977, not only affected a proviso or condition to an item of appropriation but removed it and substituted another. Further, this partial veto had the probable effect of increasing the amount appropriated for this particular purpose in any year. Thus, the Governor's partial veto of sec. 51, of ch. 107, Laws of 1977, was contrary to the purpose of the partial veto power, was not authorized by Wis. Const. art. V, sec. 10, and was invalid as a partial veto.
With respect to the other sections of ch. 107, Laws of 1977, that were subject to the Governor's partial veto, namely, secs. 9, 14 and 44, it is my opinion that these were separable provisions, that the remaining portions constitute a complete and workable law and the portions partially vetoed did not constitute provisos or conditions to an item of appropriation and thus were valid vetoes.
With respect to sec. 53 which dealt with the effective date of the application of the newly created sec. 71.095 of the statutes, I have concluded that the effect of the partial veto was to accelerate the effective date of the statute, particularly that part dealing with the deriving and appropriating of funds. In simple terms, the Governor's version would have caused the deriving and appropriating of funds to commence with individual income tax returns for the calendar year 1977, and filed in 1978; the Legislature's version would have caused the deriving and appropriating of funds one year later, commencing with individual income tax returns for the calendar year 1978, filed in 1979. It is my opinion that the acceleration of the effective date of an appropriation, can be in certain cases, and is in this case, the altering of a condition to the appropriation and further, was the equivalent of an increase in the appropriation. Therefore, I conclude that the Governor's partial veto of sec. 53 was contrary to the purpose of the partial veto power, and is likewise invalid as a partial veto. *Page 315 
The foregoing necessarily leads us to the more difficult question which is the effect of the invalid partial vetoes. The supreme court has said "This question [the effect of an invalid partial veto] is not to be answered by conjecture or speculation whether the governor would or would not have signed the act had he correctly determined the extent of his powers partially to veto it." State ex rel. Finnegan v. Dammann, supra, at p. 150. Since the Governor here partially vetoed secs. 51 and 53, which I have concluded were beyond his veto powers, and since the ascertaining of the Governor's reaction to secs. 51 and 53 had he correctly determined the extent of his powers partially to veto them would require speculation, I must conclude that the Governor objected to all of secs. 51 and 53. However, since the Governor's veto of all of those sections has the effect of eliminating the appropriations, it is necessary to consider whether the remaining portions of ch. 107, Laws of 1977, constitute a complete and workable law. Although some of the remaining portions of the chapter could survive without an appropriation, a number of them could not. Since I cannot speculate as to how the Governor might have exercised his veto powers with respect to separable or inseparable parts of ch. 107, Laws of 1977, had he correctly determined the extent of his powers partially to veto them, I must conclude that the Governor objected to all of ch. 107, Laws of 1977 (more accurately, Assembly Bill 664). Therefore, the entire bill should be returned "to that house in which it shall have originated," and that house (the Assembly) should proceed to reconsider it. Wis. Const. art. V, sec. 10.
BCL:JEA
[1] The Governor's veto message states in part:
"As amended, Assembly Bill 664 requires taxpayers to add $1 to their tax liabilities. I have exercised my partial veto within S. 71.095 (1) to restore the check-off provision that existed in the original bill.
"A tax surcharge program would be totally unworkable.
"Three states have tax surcharge programs. These programs are failures because of the minimal amount of revenue which the additional tax generates. If a surcharge program were implemented in Wisconsin, it would provide a very small percentage of the money necessary to run a campaign. It is estimated that only 1 to 3 per cent of the taxpayers would utilize this program. The dollars available to candidates under a surcharge program would not be sufficient to significantly reduce special interest contributions or entice candidates to subject themselves to spending limits.
"In most of the states using the check-off program about one-fifth of the taxpayers utilize the check-off. The estimated $1/2 million a check-off will annually raise in Wisconsin is sufficient to provide credible funding levels."
Using the Governor's three percent estimate the Legislature's version would have produced about $75,000 per year (based on an estimate of 2 1/2 million eligible taxpayers) while the Governor's version would have produced an estimated one-half million dollars annually.
[2] This appears all the more clearly from the legislative history which shows that Assembly Bill 664, as originally introduced, contained the check-off feature, which, by amendment, the Legislature rejected.