STATE EX REL. KLECZKA, and others, Petitioners, v. CONTA, and others, Respondents.

*No. 77-463-OA. Argued January 23, 1978.—Decided April 5, 1978.*
(Also reported in 264 N.W.2d 539.)

680

For the petitioners there were briefs by *Trayton L. Lathrop, Donald L. Heaney* and *Isaksen, Lathrop, Heaney & Long,* and oral argument by *Trayton L. Lathrop,* all of Madison.

For respondents Dennis J. Conta, Douglas LaFollette, and Martin J. Schreiber, there was a brief by *Irvin B. Charne, Howard B. Tolkan, Arthur J. Harrington,* and *Charne, Glassner, Tehan, Clancy & Taitelman, S. C.,* and oral argument by *Irvin B. Charne,* all of Milwaukee.

Attorney General's brief in response to order to show cause was filed by *Bronson C. La Follette,* attorney general, and *John E. Armstrong,* assistant attorney general.

HEFFERNAN, J. The petitioners in this original action are Gerald D. Kleczka, a member of the Wisconsin Senate, and John C. Shabaz, a member of the Assembly. On December 2, 1977, they filed a petition for leave to

commence an original action in this court for the purpose of securing this court's declaration in respect to the validity of a purported partial veto of an enrolled bill which originated as Assembly Bill 664. The petitioners contend that the partial veto was legally defective and, accordingly, the entire bill as enacted by the legislature was required to be published as law.

The principal respondent named in the petition is Martin J. Schreiber, Acting Governor (hereafter Governor) of the State of Wisconsin. Pursuant to an order to show cause, the petition for leave to commence an original action was heard before the court on December 23, 1977. Following the filing of a stipulation of facts by the petitioners and by the respondents, this court, on January 5, 1978, granted leave to the petitioners to commence an original action. The original action was argued before the court on January 23, 1978, and briefs were filed on the merits.

As is evidenced by our order of January 5, 1978, we have concluded that the matter is an appropriate one for declaratory judgment. There is clearly a justiciable controversy between persons whose interests are adverse and persons who have a legally protectible interest. The issue is ripe for judicial determination.

The legislation which was vetoed in part deals with financing of election campaigns by a legislatively created campaign fund. It is legislation the validity of which is of concern to the state as a whole, and the issue posed here involves the constitutional prerogatives of both the Governor and the Legislature.

The material facts are agreed to by the parties, and no fact-finding procedure is necessary. The action is appropriate for disposition as a matter of law in an original action.

Assembly Bill 664, as subsequently amended, was concurred in by the Senate on September 28, 1977. The enrolled bill was presented to the Governor on October 11,

1977. On that same day the Governor purported to exercise the partial-veto authority conferred upon him by art. V, sec. 10, of the Wisconsin Constitution. A message and a letter from the Governor was sent to the Assembly Chief Clerk on that same date. He stated that he had exercised his partial veto "to restore the check-off provision that existed in the original bill" (sec. 51) and exercised his partial veto "in Section 53 of the bill because the September 30, 1977, effective date is unnecessary to implement the law for the 1978 elections."

After the veto no part of the enrolled bill was physically delivered to the Assembly.

In the Governor's message to the Assembly, he stated that the bill as partially vetoed and partially approved was deposited in the Secretary of State's office.

The Assembly Journal dated October 12, 1977, referred to the Governor's message and letter. The receipt of the signed, enrolled bill showing the partial vetoes was formally acknowledged by the Secretary of State on October 17, 1977.

Sometime between October 17, the date of the Secretary of State's formal acknowledgment of the receipt of the bill from the Governor, and October 20, the date the bill was published, the signed, enrolled bill was exhibited to the Legislative Reference Bureau, and copies of that bill were printed by the Bureau showing the partial vetoes.

On October 20, conformed copies of the bill as partially approved and partially vetoed were submitted to the Chief Clerks of the Senate and Assembly and copies of the bill were placed in the bill jacket. Sometime after October 17, a copy of the enrolled bill as partially approved and partially vetoed was delivered to the Wisconsin State Journal, the state newspaper. The bill was published by the Wisconsin State Journal on October 20, 1977.

Subsequent to the commencement of this action and following the date of oral arguments in this court, the

legislature on January 24, 1978, acted on the Governor's partial veto, but failed to secure the necessary two-thirds vote to override the veto.

The petitioners' contentions are directed principally to the partial vetoes of the Governor of secs. 51 and 53 of the enrolled bill. Sec. 51 of the enrolled bill created sec. 71.095 of the Wisconsin Statutes to provide in part as follows:

"(1) Every individual filing an income tax statement may designate that their income tax liability be increased by $1 for deposit into the Wisconsin Election Campaign Fund for the use of eligible candidates under s. 11.50."

Acting Governor Schreiber exercised his partial veto by lining out the words, "that their income tax liability be increased by," and the words, "deposit into." The section as changed by the partial veto reads:

"(1) Every individual filing an income tax statement may designate $1 for the Wisconsin Election Campaign Fund for the use of eligible candidates under s. 11.50."

It is conceded that the bill as enrolled would require taxpayers to "add on" to their tax liabilities the sum of $1 if they wished that sum to go to the campaign fund. As changed by the Governor's partial veto, a taxpayer instead elects to designate that the sum of $1 be "checked off" or expended from the state general funds for the purposes of the Election Campaign Fund.

The parties have stipulated that the change made in sec. 51 will result in approximately $600,000 in tax funds being expended directly for political purposes per annum. Under the bill as passed by the Legislature, only the sum which taxpayers agreed to have added to their tax liability would have been used for political purposes. Under the provisions of sec. 51 as partially vetoed, the sums used for political purposes will come out of general tax revenues.

The change in sec. 53 was made by the veto of the portion which provided:

"(1) Section 71.095 of the statutes, as created by this act, shall apply to all individual income tax returns for any calendar year or corresponding fiscal year which commences not more than 9 months preceding the effective date of this act and to each calendar year or corresponding fiscal year thereafter."

It is alleged by the Attorney General[1] that the partial veto of sec. 53 accelerated the effective date of the bill by one year.

The attack on the partial veto is threefold. The petitioners, Senator Kleczka and Representative Shabaz, contend that the partial veteos were totally ineffective, because neither the enrolled bill nor the part partially vetoed was returned to the Assembly within the time limited by the Constitution. They are joined in this contention by the Attorney General.

The petitioners also contend that Bill 664 was not an appropriation bill and, therefore, not subject to the partial-veto provisions of art. V, sec. 10. The Attorney General, although he contends that the partial veto was unauthorized, acknowledges that Bill 664 was an appropriation bill within the meaning of the Constitution.

The petitioners also contend that, even were the bill held to be "returned" in accordance with the Constitution and even were it an appropriation bill, the vetoes attempted here were unauthorized by the Constitution, because the Governor may not, in the exercise of a partial veto, strike language from a bill unless it is severable and cannot strike from the bill provisos or conditions on an appropriation that were placed thereon by the Legislature. The Attorney General joins in this contention.

It is our conclusion that Enrolled Bill 664 was an appropriation bill and that a proper return was made to the

---

[1] The Attorney General was named as a respondent in the petition of Kleczka and Shabaz. He, however, joins with the petitioners in contending that the partial veto was procedurally defective. He contends that the attempted partial veto operated as a veto of the whole law.

originating house of the Legislature within the six days allowed by the Constitution. We conclude that the portions stricken were severable from the enrolled bill; and corollary to the latter conclusion, we conclude that the bill as partially vetoed by the Governor and published by the Secretary of State was a complete, workable bill, which meets the requirements heretofore stated by this court to be mandated by the Constitution. The portion approved by the Governor became effective upon publication by the Secretary of State.

We give attention to each contention in turn, considering first whether the bill was an appropriation bill in the terms of the Constitution.

The constitutional provision applicable is art. V, sec. 10. The Constitution as amended by the referendum of November 30, 1930, provides:

"Governor to approve or veto bills; proceedings on veto. Section 10. [As amended Nov. 1908 and Nov. 1930] Every bill which shall have passed the legislature shall, before it becomes a law, be presented to the governor; if he approve, he shall sign it, but if not, he shall return it, with his objections, to that house in which it shall have originated, who shall enter the objections at large upon the journal and proceed to reconsider it. Appropriation bills may be approved in whole or in part by the governor, and the part approved shall become law, and the part objected to shall be returned in the same manner as provided for other bills. If, after such reconsideration, two-thirds of the members present shall agree to pass the bill, or the part of the bill objected to, it shall be sent, together with the objections, to the other house, by which it shall likewise be reconsidered, and if approved by two-thirds of the members present it shall become a law. But in all such cases the votes of both houses shall be determined by yeas and nays, and the names of the members voting for or against the bill or the part of the bill objected to, shall be entered on the journal of each house respectively. If any bill shall not be returned by the governor within six days (Sundays excepted) after it shall have been presented to him, the same shall be a law

unless the legislature shall, by their adjournment, prevent its return, in which case it shall not be a law."

Under the Constitution only appropriation bills are susceptible to a partial veto. In the event Bill 664 was not an appropriation bill and not subject to a partial veto, the petitioners are correct and the Governor was not authorized to disapprove less than the whole of the bill.

Because we find that Bill 664 is an appropriation bill, we do not decide the effect of a Governor's attempted partial veto of a bill that is not an appropriation bill.

The petitioners concede that the bill as it left the Governor's hands was an appropriation bill, but they contend, properly, that it is not in that posture that the nature of a bill should be determined. The question is whether it was an appropriation bill when it was delivered to the Governor. They argue that the bill in its enrolled form as submitted to the Governor was not an appropriation bill.

Under the provisions of the enrolled bill, the sums added on to the taxpayers' liability and paid into the treasury are to be deposited to the general funds. The Secretary of Revenue is designated to certify the amount of money deposited in the general fund as the result of the add-on to tax liability. The amount determined under sec. 71.095, Stats., by the Secretary is then to be paid into the Wisconsin Election Campaign Fund annually, on August 15, by the State Treasurer. From that fund, there is made a continuing appropriation of money as certified under sec. 71.095 to provide for payments to the candidates who qualify under sec. 11.50.

It is clear, from these provisions, that the bill as it went to the Governor authorized the expenditure of public moneys. The bill set apart a portion of the public funds for a public purpose—the financing of election

campaigns. This meets the definitions of an appropriation bill as set forth in *State ex rel. Finnegan v. Dammann,* 220 Wis. 143, 148, 264 N.W. 622 (1936):

"In Webster's New International Dictionary the following definition is made:
" 'Appropriation bill. Govt. A measure before a legislative body authorizing the expenditure of public moneys and stipulating the amount, manner, and purpose of the various items of expenditure.'
"In *State v. La Grave,* 23 Nev. 25, 41 Pac. 1075, 1076, the court said:
" 'An appropriation in the sense of the constitution means the setting apart a portion of the public funds for a public purpose.'
"In *Hunt v. Callaghan,* 32 Ariz. 235, 257 Pac. 648, 649, the court said:
" 'An appropriation is "the setting aside from the public revenue of a certain sum of money for a specified object, in such manner that the executive officers of the government are authorized to use that money, and no more, for that object, and no other." ' " (at 148)

It should be noted, moreover, that that opinion posited: ". . . a bill containing any appropriation is an appropriation bill." (at 147) The court in *Finnegan* assumed that such contention was correct but concluded that it was inapplicable to the facts before it, because the bill before the court contained no appropriation. It held that the bill with which it was concerned was not an appropriation bill because:

"It deals with appropriations neither in the title nor in the body of the act, and would not be considered such a bill either in common speech or in the language of those who deal with legislative or governmental matters." (at 149)

Enrolled Bill 664 as it reached the Governor in the instant case is quite different than the bill before the court in *Finnegan.* Enrolled Bill 664 bears in its caption,

"An Act . . . making appropriations . . . ." Sec. 47 of the bill provides for:

". . . a continuing appropriation, from the Wisconsin election campaign fund, the moneys certified under s. 71.-095 (2) to provide for payments to candidates under s. 11.50."

Under the standards of *Finnegan,* the enrolled bill submitted to the Governor was an appropriation bill within the meaning of art. V, sec. 10, of the Constitution.

The petitioners argue, however, that "appropriation" as used in art. V, sec. 10, refers only to an authorization to expend "public money" as they believe public money is defined in *B. F. Sturtevant Co. v. Industrial Comm.,* 186 Wis. 10, 202 N.W. 324 (1925). They rely upon *Sturtevant* to support the proposition that legislative directions to disburse special funds for special purposes do not constitute an appropriation in the constitutional sense. They argue that, because the bill as it reached the Governor's desk provided that the Election Campaign Fund was to be created solely from voluntary payments, the Campaign Fund should be viewed as a special fund for a special purpose. They conclude, therefore, that the directions for disbursement of the aggregate of the add-ons is not of a public fund which may be appropriated within the constitutional meaning of that word.

We conclude that the facts of *Sturtevant* make its rationale irrelevant to the instant case. *Sturtevant* was decided prior to the 1930 amendment to the Constitution which provided for partial vetoes and was concerned, not with the Governor's authority to exercise his veto power, but with the obligation of the Legislature to make an appropriation of "public or trust money" *only upon a yea and nay vote. Sturtevant* construed art. VIII, sec. 8, of the Wisconsin Constitution, which provides in part:

"On the passage in either house of the legislature of any law which . . . makes, continues or renews an appropriation of public or trust money . . . the question shall be taken by yeas and nays, which shall be duly entered on the journal. . . ."

In *Sturtevant* the court was concerned with provisions of the Workers Compensation Act. Ordinarily, when an employee is killed in the course of his employment, the benefits are paid to his dependents. Where the worker leaves no dependents, the employer is obligated to pay a statutorily determined sum into the state treasury. The bill before the court in *Sturtevant* provided that such sums were to be paid out by the state treasury on directions of the Industrial Commission. When the bill was passed, the Senate either failed to require yea and nay votes or failed to show such votes in its journal. It was contended that the act was invalid because a yea and nay vote is required on the appropriation of public or trust money. The court held this was not public money, because it was intended for a special purpose and, accordingly, a yea and nay vote was not required. It did not, however, hold that it was not an appropriation. On the contrary, the court held, "It is plain the act 'makes . . . an appropriation of . . . money.'" (at 16) It was, however, determined that it was not the type of appropriation that requires a yea and nay vote.

While, on the basis of *Sturtevant,* it is conceivable that one could argue that a yea and nay vote was not required in respect to the passage of the appropriation section of Enrolled Bill 664, it is irrelevant to the determination of whether 664 is an appropriation bill.

We believe that the language quoted from *Sturtevant* is dispositive of the fact that the bill with which the court was concerned in that case was indeed an appropriation bill, although not one requiring yeas and nays. Moreover, *Sturtevant* goes on to say that the mere

fact that trust funds are created or disbursed would not necessarily obviate the necessity of conducting a yea and nay roll call upon passage of such legislation. The court stated:

"Other trust funds might be created from time to time which would be public funds and in which all the people of the state would have a beneficial interest, and such funds would naturally fall within the meaning and intent of the constitutional provision." (at 19–20)

Accordingly, even were we to distort the clear meaning of *Sturtevant*, the funds for election purposes which were created by the voluntary add-on provided in Enrolled Bill 664 are those in which "all the people of the state would have a beneficial interest." Even under the strained interpretation of the petitioners, the funds appropriated by the voluntary add-on would constitute an appropriation of public money requiring yea and nay votes under the authority of *Sturtevant*.

The United States Supreme Court, in discussing the federal election campaign act as amended in 1974, which appropriated funds for the financing of election campaigns, pointed out that the use of public funds to facilitate and enlarge public discussion and participation in the electoral process furthered "goals vital to a self-governing people." *Buckley v. Valeo*, 424 U.S. 1, 93 (1976). The Wisconsin law, which parallels the goals of the federal election campaign act, is one in which all the people have a beneficial interest.

The argument that Enrolled Bill 664 was not an appropriation bill is unfounded. It was a bill subject to the exercise of the governor's partial-veto power.

The petitioners additionally claim that the Governor failed to comply with the mandatory procedures of art. V, sec. 10. That section of the Constitution provides that any bill presented to the Governor and not returned by

him within six days becomes law without his approval if the Legislature is in session. Petitioners insist that the Governor did not make the return mandated by the Constitution. It is argued that, because the required return was not made, the six-day rule applies, and despite the partial veto, Enrolled Bill 664 has become a law because the Governor failed to act, as the Constitution requires, within the time period allowed.

The stipulation of the parties recites:

"7. The enrolled bill, as signed by the Acting Governor, was not delivered to the Assembly nor was any part of the signed, enrolled bill delivered to the Assembly by the Acting Governor. The Acting Governor caused nothing to be deposited with the Assembly or the clerk thereof in relation to said bill other than the aforesaid message and a letter dated October 11, 1977 from the Acting Governor . . . stating that bill 664 was partially voted and approved, signed and deposited in the Secretary of State's office. These documents were deposited with the Assembly Clerk on October 11, 1977. The Assembly Journal, dated October 12, 1977, makes reference to the aforesaid message and letter."

The petitioners, by this stipulation, acknowledge that a writing setting forth the fact of the partial veto and the reasons for the Governor's objections was timely filed with the Legislature, but they point out that the agreed facts undisputably show that neither the bill nor the part of the bill disapproved was delivered to the originating house.

The petitioners rely upon the language of the Constitution which states that, in respect to total vetoes, the Governor, if he shall not approve a bill "shall return it, with his objections, to that house in which it shall have originated." The same requirement, petitioners contend, is mandated upon the Governor in respect to partial vetoes, because the Constitution states, "the part ob-

jected to shall be returned in the same manner as provided for other bills."

From the juxtaposition of these two clauses in art. V, sec. 10, the petitioners argue that, although a part of the bill—the part not subjected to the partial veto—will become law without further action of the Legislature, nevertheless the entire bill, including the portion of the bill of which the Governor approved, must be returned.

This conclusion, on its face, is contrary to the express words of the Constitution. Without a doubt, the most the Constitution requires in respect to a partial veto is that "the part objected to shall be returned." There is no requirement that the part approved be resubmitted to the Legislature. To require such a resubmission would be meaningless and superfluous. The Legislature had already exhausted any authority it had in respect to the portion of the enrolled bill which was approved by the Governor.

This interpretation has previously been approved by this court in the case of *State ex rel. Martin v. Zimmerman*, 233 Wis. 442, 448, 289 N.W. 662 (1940). The court in that case, in referring to the contentions there that the entire bill, a portion of which had been partially vetoed, must be returned by the Governor to the house in which it originated, stated:

"This interpretation would destroy the whole purpose and effect of the 1930 amendment. . . . the argument entirely overlooks the following provision that 'the part objected to shall be returned in the same manner as provided for other bills.' If the legislature had remained in session, only the parts of Bill No. 563, S., to which the governor objected would be returned to the legislative body."

Nevertheless, it is argued further by the petitioners that it is the duty of the Governor to return the entire bill to the Legislature after the partial veto. It is con-

tended that the deposit of the approved portion of a bill with the Secretary of State, as was done by the Governor here, and its subsequent publication will result in piecemeal legislation.

The result of the practice followed by the Governor in the instant case, the petitioners claim, is that the portion approved, but only that portion, will become law upon publication. Legal rights, they point out, may arise in reliance upon the published portion of the bill, but when the Legislature thereafter acts to override a veto, those who have relied upon the partial publication may find their rights in jeopardy.

There are several answers to these contentions.

The first is the wording of the Constitution itself. Where there is but a partial approval, the Constitution provides, "the part approved shall become law." This demonstrates that the Legislature's concern with the portion of the legislation it and the Governor have approved is at an end. Only the mechanical steps to insure that there is an enforceable law in respect to the parts approved remains. That mechanical process—publication by the Secretary of State—is constitutionally mandated and is independent of further legislative action on the same bill. The Constitution provides, art. IV, sec. 17, subsec. 3, "The legislature shall provide by law for the speedy publication of all laws."

Consistent with this constitutional mandate and pursuant to similar provisions in art. VI, sec. 21, which existed prior to 1977, the legislature has enacted sec. 14.08, Stats., which provides:

"The governor shall cause all legislative acts which have become laws by his approval or otherwise to be deposited in the office of the secretary of state without delay, and shall inform thereof the house in which the respective acts originated."

Sec. 985.04(2), Stats., requires that matters which have become law be immediately published in the official

state paper. Clearly, then, the Constitution, which provides that, when a bill is approved in part, the part approved becomes law, also provides that the law shall be speedily published. The Legislature by secs. 14.08 and 985.04(2) has recognized this can only be accomplished by delivering the approved portion of the bill to the Secretary of State and not to the Legislature.

Had the Governor returned the approved portion of the bill to the Legislature, he would have acted contrary to the mandatory requirement of the Constitution, and he would have expressly flouted the legislative direction to deposit with the Secretary of State acts which become laws.

Despite what we perceive as the clear intention of a constitutional provision, the petitioners argue that, when the Governor fails to return the entire bill to the originating house, the Legislature has nothing before it and, in a sense, it would be required to violate art. IV, sec. 17, subsec. 2, which provides, "No law shall be enacted except by bill." The override of a veto, however, is not the enactment of a bill. The bill has been previously enacted. The vote by the Legislature following the veto is not for the purpose of enacting the bill, but for the purpose of nullifying the Governor's action and of allowing the previously enacted legislation to operate.

Moreover, the failure to return the entire bill, or a portion of the bill, prior to legislative action has never thwarted the right of the Legislature to act. The petitioners have aided the court by tabulating partial vetos from 1931 to 1977. By comparing the publication date set forth therein with the date on which the legislative action on the partial veto took place, it can be determined when a bill was published before the originating house had the opportunity to act on the partial veto. According to the petitioners, this is objectionable piecemeal legislation. The petitioners have set forth in their

table 108 partial vetoes. Our inspection of that table demonstrates that 64[2] bills have been enacted piecemeal in the sense used by the petitioners, *i.e.*, the part approved was published prior to the time the originating house could act on the partial veto. The petitioners have ably expressed hypothetical problems that may result from such piecemeal legislation, but in practice no such problems have arisen. There has been no showing that either the public or the private interest has been damaged by this extensive "piecemeal" type of legislation.

To return the entire bill to the originating house prior to publication would defeat the purpose which the partial-veto provision of the Constitution was intended to serve.

*State ex rel. Martin v. Zimmerman, supra,* stated that, prior to the amendment to art. V, sec. 10, which gave the governor the partial veto power, the governor was faced with a Hobson's choice when confronted with a bill which contained pressing socially necessary legislation but which also contained matters which the Governor felt were detrimental to the public welfare. His choice prior to 1930 was either to veto the bill in its entirety and forego the good the legislation would accomplish or to accept and approve the bad with the good. The Governor's dilemma—at least in respect to appropriation bills—was ameliorated by the 1930 amendment.

Were we, in the absence of a clear constitutional mandate, to insist that the Governor be required to return the approved portion of the bill to the Legislature without publication, this court would by its mandate

---

[2] This figure includes the partial veto history of Bill 431 A (1975), the publication date of which is erroneously printed in the petitioners' appendix as October 29, 1976. In fact the bill was published on October 29, 1975, prior to the legislative action on the veto on January 28, 1976.

reinstitute, to a degree at least, the very evil the amendment sought to rectify. In effect, if such were our mandate, no portion of the law, although it had received the approval of the Governor and a majority vote of the Legislature, and no matter how beneficial or necessary it might be, could have the force of law until the Legislature acted on the partial veto. This would be contrary to the purpose of the 1930 constitutional amendment. It would nullify the Governor's approval of legislation already passed.

Although the Legislature has no authority to act in respect to the portion of an enrolled bill approved by the Governor, under the procedure contemplated by the petitioners, the bill could be retained in the Legislature for an indefinite period. No procedures have been cited by the petitioners which would prevent the Legislature from holding the bill and preventing publication of a law passed by the Legislature and approved by the Governor. The Constitution, reason, and the enactments of the Legislature compel the conclusion that the portion of the bill approved by the Governor not be returned to the Legislature but, rather, that it be deposited with the Secretary of State to be published and have the force of law.

Similar factors compel the conclusion that the portion of a bill vetoed not be physically returned in bill form to the Legislature.

The Constitution provides, where there is a partial veto, "the part objected to shall be returned in the same manner as provided for other bills."

True, *State ex rel. Martin v. Zimmerman, supra,* states hypothetically and as *obiter dicta:*

"If the legislature had remained in session, only the parts of Bill No. 563, S., to which the governor objected would be returned to the legislative body." (at 448)

While it can be argued that this statement in *Martin* gives support to the petitioners' position that there should

be a physical delivery of the portions of the bill vetoed to the originating house, it is apparent that the court was not using "returned" in that sense. If its definition of "returned" were so limited, the court could not, with literal consistency, have held that the approved portion of the bill need not be returned. "Returned" is used in the sense that it means "submitted for further consideration by the legislature."

Moreover, the physical return to the Legislature of the vetoed parts of a bill would lead to an absurdity. In this case, the petitioners would have the Acting Governor send to the Legislature excisions from the enrolled bill, in respect to sec. 51, reading, "that their income tax liability be increased by," and the words, "deposit into"; and, in respect to sec. 53, the excision from sec. 1 reading:

"Section 71.095 of the statutes, as created by this act, shall apply to all individual income tax returns for any calendar year or corresponding fiscal year which commences not more than 9 months preceding the effective date of this act and to each calendar year or corresponding fiscal year thereafter."

It would seem that the separate delivery of these vetoed portions of the enrolled bill to the originating house would be pointless. Moreover, after such physical excisions, as the Acting Governor points out, the bill as approved could not then be published in a form which would demonstrate to the public the scope or effect of the Governor's partial veto. The petitioners have not questioned the respondents' position that the Secretary of State would not be obliged to publish as law a bill revealing that portions of it had been physically removed. The Secretary of State would not be required to publish it at all.

We cannot conclude that what "shall be returned" refers to the excised clippings from the enrolled bill. What must be returned and that which is the *sine qua*

*non* for further legislative action is the Governor's recitation of the portions of the bill he has refused to approve and the reasons. therefor. When a governor exercises his power of complete veto, his under-the-constitution obligation is to return the entire bill, "with his objections, to the house in which it shall have originated, who shall enter the objections at large upon the journal and proceed to reconsider it."

In other words, what is necessary for the Legislature to proceed with a vote to override a veto is a written objection by the Governor addressed to the Legislature which may be entered in the legislative journal with sufficient completeness that the Legislature knows the nature and scope of the Governor's objections. This was done. The constitutionally required return was made when the Governor submitted his objections to the bill and his veto message in a timely fashion to the originating house of the Legislature. The Constitution requires no more.

Because no conflicting constitutional requirements are put in jeopardy when an entire bill is vetoed, it is appropriate and reasonable to return the entire bill to the originating house; but neither the Constitution, public policy, nor logic requires the return of the whole bill or the excised portions of a bill in the case of a partial veto. To do so would frustrate the objectives of the 1930 constitutional amendment and of other portions of the Constitution which require that laws, as approved by the Governor, be speedily published and put into effect.

We are satisfied that the procedure used by the Acting Governor in the partial veto of Bill 664 fully complied with the mandates of the Constitution. The Acting Governor, by his letter and partial-veto message, timely informed the Legislature that he approved parts of the bill and disapproved parts of the bill. He gave his rea-

sons for his objections to the specific portions of the bill with which he was in disagreement.

He also stated in his message to the Legislature that he had delivered the official copy of the enrolled bill to the Secretary of State. Although the official receipt was not executed until October 17, 1977, after the Legislative Reference Bureau had an opportunity to assure the complete accuracy of the document, it is not argued that the enrolled bill was not in fact delivered to the Secretary of State on October 11, 1977. The Governor so stated in his message to the Legislature. Accordingly, by that delivery and by that declaration of delivery, the Governor on that date put the bill beyond his own reach. By his own actions, the Governor was no longer in a position to reconsider or to revise his previous partial approval and partial disapproval of the bill. The Governor by the delivery and by his own statement to the Legislature terminated his time for deliberation on the bill.

In addition, the Governor's message informed the Legislature that it was from that time forward within the Legislature's jurisdiction to deliberate and to consider the veto. The message was sufficient to inform the Legislature of the Governor's objections and sufficient to enable it to spread upon its journal portions of the bill objected to. This in fact the Legislature did on October 12, 1977, as is evidenced from the legislative journals.

By its actions the Legislature acknowledged the receipt of the Governor's objections and was thereafter in a position to consider action on the veto. That the Governor's message and statement of objections was sufficient is evidenced by the Legislature's ability to take action on January 24, 1978, when it failed to override the veto.

At oral argument, moreover, it was acknowledged that procedures adopted by the Legislative Reference Bureau

with the consent of the Legislature assured that accurate and reliable copies of the enrolled bill, showing the parts approved and the parts disapproved, were placed in the hands of each member of the Legislature well in advance of consideration of the veto.

Certainly, the effect of this procedure, approved by the Legislature, was to remove any possible doubt in respect to what parts of the bill were approved and what parts were disapproved.

Moreover, we find the practice utilized here by the Acting Governor to be consistent with the mandatory provisions of the Constitution even were there not a long history of similar practice acquiesced in by the Legislature.

According to exhibits furnished by the petitioners, it appears that, shortly after the constitutional amendment was adopted in 1930, it was the practice of governors to return the entire bill, including those portions vetoed, to the Legislature for further action.

We conclude, however, that under the plain meaning of the Constitution and in light of the intent of the 1930 amendment, governors who followed that practice were not required to do so and acted in derogation of the gubernatorial powers intended to be conferred by the constitutional amendment.

Additionally, it is acknowledged in respect to partial vetoes that, since 1947, with a few exceptions, it has been the practice of the governor to return neither the entire bill nor the vetoed portions of the bill to the Legislature. Instead Governors generally, since 1947, have given the Legislature only a letter and a message of objections. They delivered the entire enrolled bill to the Secretary of State showing the vetoed portions. The bill was thereupon published and, in respect to the parts approved, made effective as law—usually prior to the time the Legislature acted on the partial veto. Certainly, as conceded by the petitioners, for the last

fifteen years, more or less, there has been an acquiescence by the Legislature in the very procedure adopted by Acting Governor Schreiber.

In terms of constitutional law, the United States Supreme Court has concluded that, where Congress has acquiesced in the procedures utilized by the president in his relations to the congress, such acquiescence represents an agreement that the procedures utilized by the president properly interpreted the constitutional provisions. *Okanogan Indians v. United States (The Pocket Veto Case)*, 279 U.S. 655 (1929).

This court has followed a similar rule and stated that great weight will be attached to long continued legislative practice and acquiescence as determinative of the proper interpretation of constitutional provisions. *Integration of Bar Case*, 244 Wis. 8, 31, 11 N.W.2d 604, 12 N.W.2d 699 (1943).

We conclude, however, that, even were the practice employed by the Acting Governor in the instant case not one of long standing, the procedures employed here satisfy the mandatory requirements of the Constitution with respect to the return required to the originating house upon the exercise of a partial veto.

Having concluded that Enrolled Bill 664 was an appropriation bill, and having concluded that the Governor complied with the mandatory constitutional procedures in making his return of the partial veto to the originating house of the Legislature, the question remains whether the words excised were appropriately removed by partial veto.

The words removed had the effect of replacing taxpayers' voluntary add-on to their personal tax liabilities the sum of $1 for political purposes, with an election by the taxpayer to direct that $1 be paid out of general funds and general tax revenues.

The additional charge to the general fund is estimated to be $600,000 per annum. This the petitioners claim created an appropriation where none existed before. Implicit in the petitioners' argument and explicit in the argument of the Attorney General is the additional argument that *voluntary* contributions were a proviso or condition upon which the appropriation depended and that such proviso or condition was *ipso facto* inseverable from the appropriation itself.

The petitioners acknowledge that the Legislature cannot, by a statement incorporated in the legislation, frustrate the Governor's partial-veto power by declaring that certain portions of a bill are inseverable. In that respect, the petitioners are correct. Severability, petitioners acknowledge, is the test of the partial-veto power. Petitioners concede that what is severable may be excised from the legislation by the Governor's partial veto.

The petitioners correctly assert that severability must be determined, not as a matter of form, but as a matter of substance. The brief of the petitioners argues that a partial veto which would make an appropriation where none existed before is not a severable change.

As stated above, we conclude that, for a Governor to exercise a partial veto, the bill must, as it comes to the Governor, contain an appropriation. The principal thrust of the petitioners is based on the assumption that this bill contained no appropriation when it reached the Governor. We have concluded that assumption is incorrect. The bill clearly provided for an appropriation of funds obtained by a voluntary add-on option afforded a taxpayer. Those funds were then appropriated for election purposes by the bill.

Hence, it is incorrect, under the facts, for the petitioners to assert that the bill as altered by the Governor created an appropriation where none existed before.

The Governor's veto left the appropriation untouched. Rather, it affected the source from which the appropriated funds were to be derived. Accordingly, to conclude, as the petitioners would have us do, that this bill is inseverable because it created an appropriation where none existed before is patently incorrect.

Severability is indeed the test of the Governor's constitutional authority to partially veto a bill, but the test of severability is that established by the Wisconsin court and not by courts which operate under a different constitution. We reaffirm the conclusion reached by this court in *State ex rel. Sundby v. Adamany*, 71 Wis.2d 118, 128, 237 N.W.2d 910 (1976):

". . . that analysis of the use made of the power in the instant circumstances must be limited to application of principles expressed by this court in previous cases in which the exercise of the partial veto was challenged."

Three major Wisconsin cases have discussed the power of the Governor to partially veto a bill under the authority of art. V, sec. 10: *State ex rel. Wisconsin Telephone Co. v. Henry*, 218 Wis. 302, 260 N.W. 486 (1935); *State ex rel. Martin v. Zimmerman*, 233 Wis. 442, 289 N.W. 662 (1940); *State ex rel. Sundby v. Adamany*, 71 Wis.2d 118, 237 N.W.2d 910 (1976).

Each of these cases emphasizes that the power of the Governor to approve or disapprove a bill "in part" is a far broader power than that conferred upon Governors under the partial-veto provisions of most state constitutions. In most instances, the power of the Governor is confined to the excision of appropriations or items in an appropriation bill.

The *Henry* case, *supra*, extensively discussed the distinction between the Wisconsin Constitution and other state constitutions which give a more limited power to the Governor. The *Henry* case sanctioned the Governor's

exercise of the partial veto of appropriations, general legislation, and other parts of an appropriation bill which did not contain specific appropriations. The court concluded that any portion of an appropriation bill was severable and could be excised so long as it left, in respect to "the parts approved, as they were in the bill . . . a complete, entire, and workable law." *Henry*, at 314.

In the *Henry* case, one of the provisions vetoed by the Governor was the express statement of the legislative intent. The court acknowledged that the powers conferred on the Governor by the Constitution in respect to the partial veto were broad indeed. It stated:

"It may well be that sec. 10, art. V, Wisconsin constitution, was not intended to empower the governor, in vetoing parts of an appropriation bill, to dissever or dismember a single piece of legislation which is not severable, or so as to leave merely provisions which are not a complete or fitting subject for a separate enactment by the legislature. Although that may not have been intended, there is nothing in that provision which warrants the inference or conclusion that the governor's power of partial veto was not intended to be as coextensive as the legislature's power to join and enact separable pieces of legislation in an appropriation bill. As the legislature can do that in this state, there are reasons why the governor should have a coextensive power of partial veto, to enable him to pass, in the exercise of his *quasi*-legislative function, on each separable piece of legislation or law on its own merits." (at 314–15)

Accordingly, the court in *Henry* stated that the Governor's power to disassemble legislation by the partial veto was as broad as the Legislature's power initially to join the legislation into a single bill. It put but one limitation on the Governor's power, and that is that the remainder after partial veto be a "complete, entire, and workable law." It found in *Henry* that the part approved by the Governor constituted, independently

of the disapproved portions, a complete, entire, and workable law.

In the subsequent case of *Martin, supra,* the rationale of *Henry* was followed. Therein, the court said:

"No contention is made in the instant case that the parts of Bill No. 563, S., approved by the governor do not leave a complete body of law of proper subject matter for a separate enactment by the legislature. We think it clear that ch. 553, Laws of 1939, which contains all of Bill No. 563, S., excepting the parts thereof disapproved by the governor, constitutes an effective and enforceable law on fitting subjects for a separate enactment by the legislature." (at 449)

The court in *Martin* made clear that what must survive the Governor's veto was an enactment which could have been passed initially in the exercise of the Legislature's power and was a workable law. The test of severability was set forth in those terms only. As the court stated in *Martin:*

"The question here is whether the approved parts, taken as a whole, provide a complete workable law. We have concluded that they do, and we must give them effect as such." (at 450)

The workable-law test was reemphasized in *Sundby, supra.* The court there stated:

"[T]he action taken by the governor was valid, in that the portions vetoed, although not actually items of appropriation, were separable provisions, not constituting provisos or conditions to an item of appropriation, and the remaining portions constitute a complete and workable law." (at 135)

We conclude that the test of severability has clearly and repeatedly been stated by this court to be simply that what remains be a complete and workable law. The power of the Governor to disassemble the law is

coextensive with the power of the Legislature to assemble its provisions initially.

This conclusion in respect to severability is consistent with the Legislature's own declaration. In sec. 990.001 (11), Stats., the Legislature stated, "The provisions of the statutes are severable. The provisions of any session law are severable. . . ."

While that legislative declaration is concerned primarily with the construction and effect of legislation which may be in part defective, it evinces a general legislative purpose to give force to portions of legislation which survive a constitutionally authorized nullification, whether that nullification be by the courts or by the Governor.

In the present case it is undisputed that what remained after the Governor's partial veto is a complete, entire, and workable law. As such, it is severable and reflects the proper exercise of the partial-veto power conferred on the Governor by the Constitution of the state.

In addition, the cases decided by this court have repeatedly pointed out that, because the Governor's power to veto is coextensive with the legislature's power to enact laws initially, a governor's partial veto may, and usually will, change the policy of the law. The *Martin* case specifically recognized that:

"It must be conceded that the governor's partial disapproval did effectuate a change in policy; so did the partial veto of the bill involved in the case of *State ex rel. Wisconsin Tel. Co. v. Henry.*" (at 450)

In *Sundby, supra,* we pointed out that the Wisconsin case law recognizes that the Governor has a constitutionally recognized role in legislation. We stated in *Sundby:*

"Some argument is advanced that in the exercise of the item veto the governor can negative what the legislature has done but not bring about an affirmative

change in the result intended by the legislature. We are not impressed by this argued distinction. Every veto has both a negative and affirmative ring about it. There is always a change of policy involved. We think the constitutional requisites of art. V, sec. 10, fully anticipate that the governor's action may alter the policy as written in the bill sent to the governor by the legislature." (at 134)

Thus, the fact that the Acting Governor's partial veto in the instant case changed the policy of the legislation from that of encouraging add-ons to a taxpayer's personal liability to that of imposing a charge on the general fund does not lead to the conclusion that the veto power was unconstitutionally exercised. It reflected a change of policy which the Governor had the authority to make under the Constitution because his authority is coextensive with the authority of the Legislature to enact the policy initially.

It should be borne in mind, of course, that the very section of the Constitution which gives to the Governor the authority to change policy by the exercise of a partial veto also gives the final disposition and resolution of policy matters to the Legislature. The Governor's changed policy can ultimately remain in effect only if the Legislature acquiesces in a partial veto by its refusal or failure to override the Governor's objections.[3]

[3] This division of legislative power between the legislature and the executive is characteristic of our constitutional system of checks and balances. Each branch of government must be able to protect itself from intrusions by the other branches. *The Federalist* No. 73, 492, 494 (A. Hamilton) (J. Cooke ed. 1961). Accordingly, each branch is given some power within spheres primarily controlled by the other branches. The veto power of the governor, legislative in nature, is but one example of a constitutional check and balance, and, as such, it represents a deviation from the strict theory of separation of powers. E.

There remains yet another facet of the authority of the Governor to exercise a partial-veto power that should

Mason, *The Veto Power*, sec. 100 (A. B. Hart ed. 1890); Stewart, *Constitutionality of the Legislative Veto*, 13 Harv. J. Legis. 593, 598–600 (1976); 6 U. Mich. J. L. Ref., *Separation of Powers: Congressional Riders and the Veto Power*, 735, 748–49 (1973). In Wisconsin law, it is settled that the Governor plays a role in the legislative process through the exercise of the veto power. *E.g.*, *State ex rel. Wisconsin Telephone Co. v. Henry*, 218 Wis. 302, 315, 260 N.W. 486 (1935).

The dissent cites Montesquieu on the necessity of maintaining a strict separation of powers. Not even Montesquieu, however, advocated absolute separation of powers, as is demonstrated in *The Federalist* No. 47 (J. Madison) (J. Cooke ed. 1961). The early constitutions of the several states recognized the "impossibility and inexpediency" of total separation. *Id.* No. 47, at 327.

The dissent correctly expresses concern over possible abuses by the executive of the partial-veto power. The authors of *The Federalist*, however, repeatedly alluded to the tendency, in republican forms of government, to the aggrandizement of the legislative branch at the expense of the other branches. *Id.* No. 48, at 333 (J. Madison); No. 49, at 341 (J. Madison); No. 73, at 494 (A. Hamilton). It is no answer to appeal to the separation-of-powers doctrine, because the true meaning of that doctrine is entirely compatible with a partial intermixture of the branches for special purposes. *Id.* No. 66, at 445 (A. Hamilton). The appropriate balance between the executive and the legislature with respect to the veto power is not, therefore, to be struck by reference to an abstract principle set forth by Montesquieu, but by reference to the language of the Wisconsin Constitution.

The very language of Montesquieu relied upon by the dissent was specifically discussed and explained by Madison in *The Federalist*. He demonstrated that the separation-of-powers doctrine set forth by Montesquieu did not require a strict division of functions between the three branches of government. Madison stated:

"[H]e [Montesquieu] did not mean that these departments ought to have no *partial agency* in, or no *controul* over the acts of each other. His meaning, as his own words import, and still more conclusively as illustrated by the example in his eye, can amount to no more than this, that where the *whole* power of one department is exercised by the same hands which possess the *whole* power of

be explored. It is urged by the petitioners and by the Attorney General that provisos and conditions of an appropriation may not be severed from the appropriation itself. It is argued that, even when a workable bill remains after the exercise of the partial veto, the fulfilment of that test alone does not make what remains a properly severable and independent bill. The position of the antagonists to the Governor's partial veto in this case is that, whenever an appropriation is made on the

another department, the fundamental principles of a free constitution, are subverted." *Id.* No. 47, at 325–26.

More recently, Richard Neustadt in his volume, *Presidential Power* (1961), pointed out that the phrase, "separated powers," tended to trap Americans into a stereotyped conception of democratic government that was never intended by the founding fathers. He wrote:

"The constitutional convention of 1787 is supposed to have created a government of 'separated powers.' It did nothing of the sort. Rather, it created a government of separated institutions *sharing* powers." (at 33)

A recognition of this principle of shared powers was voiced by President Eisenhower when he stated in 1959, "I am part of the legislative process." *Id.*, at 33.

Even these accepted principles of shared, rather than completely separated, powers under the United States Constitution do not reflect the broader grant of legislative power to the Wisconsin Governor under the partial-veto authority of art. V, sec. 10. The separation-of-powers doctrine of the Federal Constitution, moreover, is inappropriate to the partial-veto power of the Wisconsin Governor, for the President has no partial or item veto authority. Also, as is shown elsewhere in this opinion and in prior opinions of this court, the partial-veto power of the Wisconsin Governor is far broader than the item-veto power conferred by the constitutions of other states. It is, therefore, constitutionally inappropriate to find answers to Wisconsin constitutional problems in respect to partial-veto powers by resort to the cliches that have supplied an unwarranted gloss on the true meaning of federal "separation of powers" or by seeking to analogize or to equate the Wisconsin Constitution with other state constitutions containing more restrictive grants of legislative power to the governor.

basis of a legislatively established proviso or condition, the provisos themselves may not be separately vetoed, but the entire appropriation, including the provisos, must be excised by the Governor.

In the instant case it is argued that the appropriation of moneys for political purposes was conditioned by the Legislature upon the voluntary contribution to be made by taxpayers and that proviso or condition is inseverable from the appropriation itself.

The conclusion urged by the petitioners and the Attorney General reasonably could be reached from the dicta of Wisconsin cases. We are satisfied, however, that those pronouncements are dicta only and, more importantly, have no relevance to interpretation of the partial-veto provisions of the Wisconsin Constitution.

In *Henry, supra,* the first case to come before the court on the partial veto, petitioners therein relied upon *State ex rel. Teachers & Officers v. Holder,* 76 Miss. 158, 23 So. 643 (1898).[4] The objectors to the exercise

---

[4] *Holder* is one of the earliest and most influential cases on the scope of the partial-veto power. It is clearly the seminal case on the issue of the governor's power to veto a proviso or condition to an appropriation and has been cited frequently by other courts. Many of the cases relying on *Holder,* however, have arisen in states where the governor's partial-veto power is limited to vetoing "items" as opposed to "parts" of the bill. *E.g., Fairfield v. Foster,* 25 Ariz. 146, 214 P. 319 (1923); *Black & White Taxicab Co. v. Standard Oil Co.,* 25 Ariz. 381, 218 P. 139 (1923); *Fergus v. Russel,* 270 Ill. 304, 110 N.E. 130 (1915); *State ex rel. Cason v. Bond,* 495 S.W.2d 385 (Mo. 1973); *State ex rel. Sego v. Kirkpatrick,* 86 N.M. 359, 524 P.2d 975 (1974); *Commonwealth v. Dodson,* 176 Va. 281, 11 S.E.2d 120 (1940). Reliance on *Holder* even in the context of an "item veto" power is misplaced and is a mere "make-weight." In an "item veto" state, it would appear that provisos or conditions may not be vetoed, because such veto would subdivide the item, contrary to the constitutional provision. *Holder,* which rests in part on a specific constitutional reference to the power of the legislature to impose conditions (see text, *infra*), is *sui generis* and was unnecessary as authority in

of the governor's partial-veto power in *Henry* contended that the governor was not empowered to disapprove a proviso or a condition placed upon an appropriation. The court in *Henry* found, however, that the portions vetoed were neither a proviso nor a condition which the legislature had placed upon the appropriation. The court said:

". . . we find it unnecessary to decide in this case whether the governor is empowered to disapprove a proviso or condition in an appropriation bill, which is inseparably connected with the appropriation, because, upon analyzing the terms of the bill in question, we have concluded, for reasons hereinafter stated, that the parts which were disapproved by the governor were not provisos or conditions which were inseparably connected to the appropriation. If they had been, the decision in *State ex rel. Teachers & Officers v. Holder,* 76 Miss. 158, 23 So. 643, would afford support for the plaintiff's contention." (at 309–10)

This is dicta, because the issue was not raised in the *Henry* case. The *Henry* case does not hold that the governor cannot disapprove a condition placed upon an appropriation by the legislature.

The dicta in *Henry* is typical of the custom, unfortunately too often indulged in by courts, of telling a disappointed litigant that, "You are wrong in this case, but if the facts were different you might be right." The *Henry* case represents an inconsidered statement by the court on an issue not before it and has no precedential value. The dicta was, however, alluded to in *Sundby,* in which this court concluded:

"[T]he action taken by the governor was valid, in that the portions vetoed, although not actually items of appropriation, were separable provisions, not constituting

"item veto" states, and is inappropriate and irrelevant to the partial-veto powers of the Wisconsin Governor.

provisos or conditions to an item of appropriation, and the remaining portions constitute a complete and workable law." (at 135)

No provision of art. V, sec. 10, of the Constitution limits the Governor's authority to veto appropriations because of any legislatively imposed conditions. The alleged limitation arises from the language of *Henry*. The source of the dicta which has led to the contention of the petitioners is apparent from the text of *Henry*. *Henry* relies upon the Mississippi case of *Holder, supra,* for the contention that the governor's partial-veto power cannot be exercised when there are legislatively imposed provisos or conditions on an appropriation. The *Holder* case itself, however, cites no authority for a general proposition that a governor cannot veto a proviso or condition to an appropriation. It should be noted that, although the Mississippi Constitution is similar to the Wisconsin Constitution in that it provides that the governor may veto "parts" of an appropriation bill, another portion of the Mississippi Constitution, sec. 69, specifically provides that the legislature has the power to set conditions under which appropriated money is to be paid. This is a constitutional provision which has no counterpart in the Wisconsin Constitution. Sec. 69 may well justify in *Holder* the language in respect to "conditions," for in Mississippi the governor apparently may not veto a proviso or a condition to an appropriation. That concept, however, finds no support in the Wisconsin Constitution.

We are satisfied that, had the Wisconsin court in *Henry* found that there was indeed a condition to the appropriation which had been vetoed by the governor, it would have been obliged to look to the rationale of *Holder,* and it would have concluded that that rationale, although arguably appropriate to Mississippi and its constitutional provisions, was inapplicable as a limitation

of the partial-veto power of the governor under the Wisconsin Constitution.

The dicta, in reliance upon *Holder,* which appears in *Henry* and in subsequent Wisconsin cases, does not correctly state the Wisconsin law. Under the Wisconsin Constitution, the governor may exercise his partial-veto power by removing provisos and conditions to an appropriation so long as the net result of the partial veto is a complete, entire, and workable bill which the legislature itself could have passed in the first instance.

Unlike the fact situation in *Henry,* the Acting Governor vetoed what is arguably a condition which the Legislature had placed on the appropriation. By so doing, he changed the policy of the law as envisaged by the Legislature. He caused the general fund to be charged with an obligation which the Legislature did not anticipate; and also, it is contended, he accelerated the effective date of the bill. These are policy changes, legislative in nature, which the Constitution authorized him to make.

The bill was an appropriation bill. What remained after the Governor's partial veto was a complete, entire, and workable bill. As such it was severable from the legislative package of the enrolled bill. The Acting Governor complied with the constitutional mandates by timely and appropriately messaging his objections to the house of the Legislature in which the bill originated. He made an appropriate return of the vetoed legislation as the Constitution contemplates it. We accordingly hold that Acting Governor Schreiber constitutionally exercised the power of partial veto as conferred upon governors of Wisconsin by art. V, sec. 10, of the Constitution.

*By the Court.*—Rights declared validating the partial vetoes exercised by the Governor pursuant to art. V, sec.

10, Wisconsin Constitution, upon enrolled Assembly Bill 664, published as ch. 107, Laws of 1977. Relief requested by petitioners denied.

No questions concerning the validity of ch. 107, Laws of 1977, other than those relating to the approval, enactment, and publication thereof, are now determined.

CONNOR T. HANSEN, J. *(concurring in part, dissenting in part).*

The majority of the court holds that Assembly Bill 664 was an appropriation bill and that, under the facts of this case, the partial veto should not be invalidated because the governor did not timely return the enrolled bill or the part partially vetoed to the assembly. I concur in the result reached by the majority on these issues.

However, I believe that a comment is appropriate with regard to the procedures followed by governors in recent years when exercising their powers of partial veto. The parties have stipulated that neither the enrolled bill, nor the parts of the bill disapproved, nor the language of the parts approved, were delivered to the legislature by the governor in the present case. Instead, the governor submitted a veto message setting forth the fact that he had partially vetoed the bill and a letter stating his objections to the bill as enacted.

The fact is that the return of the governor to the legislature did not identify the exact wording objected to, nor was this wording made known to the legislature within the six days prescribed in art. V, sec. 10 of the Wisconsin Constitution for the return of the vetoed portions of the bill. Precise copies of the enrolled bill, showing the parts vetoed, were subsequently made available to the legislature as a result of informal procedures adopted by the Legislative Reference Bureau.

Affidavits and tabulations filed with this court in connection with this case show that the practice of previous

governors has not been consistent. The practice in the years immediately following creation of the partial veto power was generally to return the enrolled bill to the originating house for review of the partial veto. The parties disagree as to the practice in succeeding years, but it is clear, from the information supplied by the parties, that the practice has varied, not only from one governor to the next, but from one veto to the next.

The absence of any formalized or consistent procedure has, in part, made this litigation necessary and is likely to contribute to future litigation. I am mindful that this court will not interfere with the internal procedures of the legislature. However, we are concerned here not only with the integrity of the legislative process itself, but also with the provisions of the constitution authorizing the exercise of the partial veto power.

Under these circumstances, I would deem it appropriate for this court to specify procedures for the return by a governor of the portions of a bill objected to. Since the court has declined to prescribe such procedures, it would be proper for the legislature to consider doing so, consistent with the opinion of the court.

I specifically note that recent governors have discontinued the practice, followed by certain of their predecessors, of setting forth verbatim the portions stricken from partially vetoed bills in their veto messages to the legislature.

Unofficial reproductions of the vetoed portions are available through the informal procedures of the Legislative Reference Bureau, and the legislature is not, as a practical matter, left in profound ignorance of the executive action. Nevertheless, under the present practice, the legislature is not timely provided with an official version of the bill as partially vetoed.

The dignity and integrity of the legislative process would be better served, and future litigation avoided, by

the establishment of procedures to guarantee at least a minimum of regularity in the return of a partial veto to the originating house.

". . . [T]he extraordinary character and far reaching consequences of the act of veto are some indication of a necessity that it shall be exercised with a regularity and orderliness commensurate with its importance." *Tuttle v. Boston,* 215 Mass. 57, 60, 102 N.E. 350 (1913).

I respectfully dissent from the holding of the majority that the power of partial veto, as exercised in this case, is a valid exercise of that authority.

In the Wisconsin Constitution, as in the federal constitution, the principle of separation of powers is nowhere expressly stated, but it is recognized as implicit in the provisions vesting the legislative, executive and judicial powers of the state in the respective branches of government. Our constitution provides for three branches of government, separate and co-ordinate, each supreme in its sphere and independent of the others. None may perform the functions or exercise the powers of another. This court has jealously guarded this concept, in the belief that an invasion of the province of one branch by another is an attack upon the constitutional foundation of the government itself, and in a sense, upon the liberty of our citizens. *State ex rel. Broughton v. Zimmerman,* 261 Wis. 398, 404, 405, 410, 411, 52 N.W.2d 903 (1952) ; *Goodland v. Zimmerman,* 243 Wis. 459, 466, 467, 10 N.W.2d 180 (1943) ; *State ex rel. Rodd v. Verage,* 177 Wis. 295, 322, 187 N.W. 830 (1922) ; *In re Appointment of Revisor,* 141 Wis. 592, 596, 124 N.W. 670 (1910).

Although there have developed between the several branches of government "great borderlands of power" in which it is difficult to determine where the functions of one branch end and those of another begin, *In re Appointment of Revisor, supra,* at 597, it is nonetheless

the province and the duty of the judicial branch of government to mark the constitutional boundaries of each branch and to remedy invasions by one branch of the territory of another. *State ex rel. Mueller v. Thompson,* 149 Wis. 488, 137 N.W. 20 (1912).

Article IV, section 1, of our constitution provides that "The legislative power shall be vested in a senate and an assembly." The constitutional role of the governor in the legislative process includes the power to convene special sessions of the legislature; to communicate with, and make recommendations to, the legislature; to direct the preparation of the financial budget; and to veto bills which have been passed by the legislature, Art. V, secs. 4 and 10, Wisconsin Constitution, and sec. 16.46, Stats., *State ex rel. Sundby v. Adamany,* 71 Wis.2d 118, 131, 237 N.W.2d 910 (1976). Nevertheless, the fundamental concept of Art. IV, sec. 1, is that the legislative power of this state is confined exclusively to the legislature. *State ex rel. Broughton v. Zimmerman, supra,* at 405, 410; *Goodland v. Zimmerman, supra,* at 467; *In re Appointment of Revisor, supra,* at 597, 598; *see: State ex rel. McCormack v. Foley,* 18 Wis.2d 274, 277, 118 N.W.2d 211 (1962). Unless we are prepared to abandon that concept—and I am not prepared to do so—then there must be some palpable limit to the power of the governor to rewrite, by the device of the partial veto, bills which have passed the legislature.

In recent years, partial vetoes have not only increased greatly in number; they have been applied to ever smaller portions of bills. Several years ago, an attempt was made to exercise the power so as to strike the digit "2" from a $25 million bonding authorization. Even this may not mark the limits of the use of the power. Advisors to a recent governor were reported to have considered striking the letter "t" from the word "thereafter" in order to alter the effective date of a liquor tax

increase. Only the limitations on one's imagination fix the outer limits of the exercise of the partial veto power by incision or deletion by a creative person. At some point this creative negative constitutes the enacting of legislation by one person, and at precisely that point the governor invades the exclusive power of the legislature to make laws.

Long before the advent of the partial veto, the father of the doctrine of separation of powers, Baron de Montesquieu, warned that liberty would be endangered if the executive were to have the power of ordaining laws by his own authority or of amending what had been ordained by others, and he urged that the executive should have no part in legislating other than the privilege of rejecting what had been enacted by the legislature.[1] I believe Montesquieu was correct. In the scheme of our constitution, the governor is to review the laws and not to write them. He is not, by careful and ingenious deletions, to effectively "write with his eraser" and to devise new bills which will become law unless disapproved by two-thirds of the legislators who are elected by the people of the state.

In principle, this is clear enough. What gives pause to the majority, I suspect, is the difficulty of applying these principles to concrete cases, especially under the approach used by this court in *State ex rel. Sundby v. Adamany, supra,* and the majority in the instant case. This is so because the exercise of the partial veto power by the executive shades into the powers of the legislature. As the *Sundby Case* recognized, every veto has both an affirmative and a negative ring about it. Every veto necessarily works some change of policy, and in a sense partakes of legislating. Here lies the difficulty

---

[1] Montesquieu, *The Spirit of the Laws,* Vol. I, Book XI, Chapter 6 (Hafner, New York, 1966), 156, 159, 160.

the majority confronts in saying precisely where the proper sphere of the executive ends and that of the legislature begins.

The majority is rightfully wary of the elusive tests enunciated in some other jurisdictions. To hold that the exercise of the partial veto power may not have an "affirmative," "positive" or "creative" effect on legislation, or that the veto may not change the "meaning" or "policy" of a bill, as some courts elsewhere have done, would be to involve this court in disengenuous semantic games. While these tests may be appealing in the abstract, they are unworkable in practice. Every veto may be perceived in affirmative or negative terms, and as either conforming to or defying the general legislative intent, depending upon the observer's perspective. These tests are inescapably subjective. Without an objective point of reference, this court would be reduced to deciding cases upon its subjective assessment of the respective policies espoused by the legislature and the executive, an unseemly result which would foster uncertainty in the legislative process. More importantly, such a result would defeat its own purpose; the judicial department may no more assume the proper functions of the legislature, or interfere with their discharge, than may the governor.

Perhaps for this reason, the decisions of this court have steadily fashioned a standard which affords the governor virtually unlimited power to rework legislation by means of the partial veto. In the early cases of *State ex rel. Wisconsin Tel. Co. v. Henry,* 218 Wis. 302, 260 N.W. 486 (1935), and *State ex rel. Martin v. Zimmerman,* 233 Wis. 442, 289 N.W. 662 (1940), this court focused on the question whether the portions of a bill remaining after the exercise of the partial veto power provided a complete and workable law, but also required that the parts vetoed be severable, and implied, without

so holding, that parts which constituted conditions, contingencies, or provisos imposed by the legislature could not be severed. In the recent *Sundby Case, supra,* this court reiterated the limited requirement that the portions of the bill approved by the governor must provide a complete, workable law, and emphasized that the governor was free to change the policy of the bill as enacted by the legislature. Again, however, the court held open, without deciding, the possibility that portions of a bill which are contingencies, provisos, or conditions, might not be separable. Therefore, until the present case, this court, at least by *dicta,* has recognized that there must be some limitation on the exercise of the partial veto by the governor.

The majority now jettisons the never-applied exception for "conditions, provisos and contingencies," and, for all practical purposes, any other limitation on the partial veto power. This step is no doubt logical and necessary for the majority to hold that, "The power of the Governor to disassemble the law is coextensive with the power of the Legislature to assemble its provisions initially." When the court holds that a governor may freely alter the evident intent or policy of the legislature, it is no doubt consistent to permit him to remove conditions and contingencies, which, after all, are no more than manifestations of legislative policy or intent. However, this writer is unable to find language in art V, sec. 10, to support such a sweeping construction of the partial veto power, nor has attention been directed to authorities in this state or any other state which would suggest that such was the intent of the 1930 constitutional amendment which created that power.

Having discarded the provisos-and-conditions exception, the majority holds that a partial veto of an appropriation bill is valid, provided only that "the net result . . . is a complete, entire, and workable bill which the

legislature itself could have passed in the first instance." In my opinion this court has gone too far and should retrace its steps. The standard approved today gives the governor wide, and for all practical purposes, unlimited, authority to exercise power reserved by the constitution to the legislature. In reality, the purported limitation that the remainder of any bill, after the exercise of a partial veto, must be a workable law, imposes little constraint upon such a usurpation of legislative power. It is difficult to envisage a governor deliberately exercising the partial veto power so as to produce a fragmentary or unworkable law.

Although in *Sundby, supra,* we held open the question whether a governor could alter an appropriation bill by striking a portion of an appropriation figure, the test stated by the majority affords no discernible basis for objection to such a veto, if the remainder of the bill is workable. Further, in the case before us, the legislature provided for the collection and disbursement of a voluntary payment by the taxpayer. By exercise of the partial veto power, the governor has effectively increased an appropriation by producing a charge on the general fund of an estimated $600,000 per annum.[2] Under the test pronounced by the majority it therefore becomes unobjectionable to increase an appropriation by the exercise of the partial veto power.

Even more disturbingly, the standard adopted by the court poses no discernible obstacle to the use of deletions to produce a complete, entire and workable bill concerning a subject utterly unrelated to that of the bill as passed by the legislature. Might an appropriation for a

---

[2] If the increased appropriation effected in this case is not apparent (the majority concludes that the governor's veto "left the appropriation untouched"), such a veto can readily be imagined. For example, a bill providing for appropriation of a fixed sum in "every other month" might be increased by striking the word "other."

gubernatorial commission be transformed to provide the governor with a second salary? In all probability we will not soon face such a question, but the clear lesson of experience is that we ought not discount such ingenuity. I am unable to identify, in the majority opinion, even an implicit obstacle to such an abuse of the veto power. I fear that the court may now have painted itself into a corner, and that a time may come when we regret having done so.

The original purposes of the partial veto power, and the language of this court's early decisions defining that power, suggest an alternative solution, a solution that, in my opinion, would be consistent with the purposes of the partial veto power, provide a neutral benchmark from which the actions of the governor might be measured, and also preserve the prerogatives of the legislature.

The purpose of the partial veto power was described in *State ex rel. Martin v. Zimmerman, supra,* at 447, 448:

"Sec. 10, art. V, of our state constitution is not ambiguous. As amended in 1930 it must be construed as a whole. In so construing it we entertain no doubt either as to the reason for, or the meaning of, the 1930 amendment . . . Its purpose was to prevent, if possible, the adoption of omnibus appropriation bills, logrolling, the practice of jumbling together in one act inconsistent subjects in order to force a passage by uniting minorities with different interests when the particular provisions could not pass on their separate merits, with riders of objectionable legislation attached to general appropriation bills in order to force the governor to veto the entire bill and thus stop the wheels of government or approve the obnoxious act. Very definite evils were inherent in the lawmaking processes in connection with appropriation measures. Both the legislature and the people deemed it advisable to confer power upon the governor to approve appropriation bills in whole or in part. . . ."

The partial veto power was therefore directed toward the legislative practice of uniting in a single bill various

proposals, each of which would have constituted a complete and workable bill in itself.

Prior to the constitutional amendment, the improper joinder of such proposals prevented the governor from dealing separately with each "part" which would otherwise have constituted a separate proposal. The partial veto provisions gave the governor power to unpack omnibus appropriation bills, and to pass separately upon each of the constituent parts which, if not for the practice of jumbling bills together, would have been enacted individually, and would have constituted a complete, entire and workable bill.

The governor's power to dismantle an appropriations bill was made as extensive as the legislative's power to construct such a bill from independent proposals capable of separate enactment.

I believe this is what this court had in mind when, in the first case to consider the scope of the partial veto power, it described the power to be "coextensive as the legislature's power to join and enact separable pieces of legislation in an appropriation bill." *State ex rel. Wisconsin Tel. Co. v. Henry, supra,* at 315. The court explained:

". . . As the legislature can do that in this state [join and enact separable pieces of legislation in a single bill], there are reasons why the governor should have a coextensive power of partial veto, to enable him to pass, in the exercise of his *quasi*-legislative function, *on each separable piece of legislation or law on its own merits.* That is not necessary in many states because they have constitutional provisions which prohibit the legislature from passing a bill which contains more than one subject. Wisconsin, however, has no such prohibition except as to private and local bills (sec. 18, art. IV, Wis. Const.). As far as general legislation is concerned, the legislature may, if it pleases, unite as many subjects in one bill as it chooses. *Therefore, in order to check or prevent the evil consequences of improper joinder,* so far, at least, as

appropriation bills are concerned, it may well have been deemed necessary, in the interest of good government, to confer upon the governor, as was done by the amendment in 1930 of sec. 10, art. V, Wisconsin constitution, the right to pass independently *on every separable piece of legislation* in an appropriation bill." *State ex rel. Wisconsin Tel. Co. v. Henry, supra,* at 315. (Emphasis added.)

This, in my opinion, is an accurate statement of the purposes and nature of the partial veto power of the governor. The power thus conferred is not a power to reduce a bill to its single phrases, words, letters, digits and punctuation marks. Rather the partial veto power should be exercised only as to the individual components, capable of separate enactment, which have been joined together by the legislature in an appropriation bill. That is, the portions stricken must be able to stand as a complete and workable bill.

Also, as stated by the majority, the portions of a bill approved by the governor must constitute a complete, entire, and workable law. However, I do not consider this "limitation" to say anything which is not implicitly true of every legislative enactment. Any enactment, whether passed by the legislature and approved by the governor, or created by use of the partial veto power, will fail if it is fragmentary, patently incomplete, or incapable of execution.

The approach here set forth would effectively define the limits of the constitutional role of the governor. He would be able to veto independent elements of multi-subject appropriation bills, and would in most cases be unable to effectively add elements to the bills enacted by the legislature. His veto would be directed to portions of an appropriation bill which were grammatically and structurally distinct, and he would not be able to deal individually with numbers or words, or single digits or letters.

Equally important, this standard would be capable of even-handed and predictable application, and this court would not be required to mediate policy disagreements between the two other coordinate branches of our government. Most important, this approach would protect the prerogatives reserved to the legislature by the constitution and would fulfill the responsibility of this court to determine when the exclusive territory of one of our independent branches has been invaded by another.

It appears that we have now arrived at a stage where one person can design his own legislation from the appropriation bills submitted to him after they have been approved by the majority of the legislature. The laws thus designed by one person become the law of the sovereign State of Wisconsin unless disapproved by two-thirds of the legislators. I am not persuaded that art. V, sec. 10, was ever intended to produce such a result.

There can be no question that the partial vetoes presently before the court do not meet the standard herein set forth. The governor partially vetoed section 51 of the bill as passed by the legislature by striking the words "that their income tax liability be increased by," and the words "deposit into." There is no method by which these portions can be said to constitute an independent legislative proposal capable of separate enactment, and I would therefore hold that the governor has exceeded the limits of the power conferred upon him by the partial veto provision, and has improperly assumed power reserved to the legislature.